John C. TAYLOR and Evelene B. Taylor, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8289.

United States Court of Appeals Fourth Circuit.

Argued April 14, 1961.

Decided Jan. 4, 1962.

J. Alex Neely, Jr., Anderson, S. C., for petitioners.

Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Before SOPER, HAYNSWORTH, and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The taxpayers contest the Commissioner's recomputation of certain capital gains realized by them. In this court, they undertake to relitigate issues, largely factual, resolved against them by the Tax Court. Since the findings of the Tax Court are supported by substantial evidence and are not clearly erroneous, we necessarily affirm.

The taxpayers, husband and wife, filed a joint return in 1951. The return disclosed ordinary income, which was more than offset by allowable deductions, including a substantial loss in the operation of a farm. On this return, they also reported net gain of $314,196, realized by the husband upon the sale, during the year, of his stock interest in the Independent Publishing Company of Anderson, South Carolina. The Commissioner increased the gross sales price of this stock from $420,000 to $432,112.30, by reason of a cancellation by the Publishing Company of a receivable due from the husband of $12,112.30. The Commissioner also reduced the claimed cost basis from the taxpayer's appraisal of the worth of his stock when acquired to the amount of his original investment in the newspaper venture in 1925. Thereafter, the taxpayer sought to allocate a portion of the sales price of the stock to the settlement of his claim to a proprietary interest in a radio station which had undistributed net profits, so that he

might report a portion of the sales price as ordinary income from which he could deduct South Carolina income taxes paid. Alternatively, he contended that he should be allowed to deduct the South Carolina income taxes attributable to the gain on the sale as an expense of the sale.

The Tax Court, making detailed findings of fact, resolved all of the issues in favor of the Commissioner.

### Cost Basis of the Stock

In February 1925, Mr. Wilton Hall was the owner and publisher of a newspaper, the Anderson Independent, which he had founded a year earlier, and which had a paid circulation of about three thousand. There was a competing newspaper in Anderson known as the Tribune, the publisher of which had died some years earlier, and since then it had been operated by his estate. In February 1925, the Tribune had a paid circulation of some eleven hundred, but it had an exclusive franchise in Anderson, South Carolina, for the Associated Press wire services.

Hall and one Morris entered into negotiations looking toward an acquisition of the Tribune, from which they learned that the Tribune could be acquired for $20,000.

The taxpayer, John C. Taylor, was then the Clerk of the Court of Common Pleas for Anderson County, and a friend of Hall's. On previous occasions, Taylor had advanced money to Hall. The taxpayer paid over $12,500 for the purpose, according to the taxpayer, of having Hall, as the taxpayer's agent, purchase the Tribune. According to Hall, however, his purpose, and that of the taxpayer, at the time was to acquire the Tribune in the name of a new corporation, to which Hall would also transfer his newspaper, the Independent, so that the two might be combined. In any event, in February 1925, Hall and Morris obtained a South Carolina charter for a new corporation known as the Independent Publishing Company and having an authorized capital of $30,000. The charter of the Independent Publishing Company was not recorded in the office of the Clerk of the Court of Common Pleas for Anderson County until November 3, 1925, after Mr. Taylor, the Clerk and the taxpayer here, in correspondence with the Secretary of State of South Carolina had succeeded in effecting certain changes in the corporate charter, particularly the elimination of a reference to Morris as a stockholder. None of the stock of Independent Publishing Company was actually issued until 1927, when 145 shares were issued to Taylor and 30 shares were issued to Hall. Later, additional shares were issued, so that Taylor became the owner of 150 shares and Hall the owner of a like number.

Meanwhile, in February 1925, a petition had been filed in the Probate Court for Anderson County, having supervision over the administration of the estate which owned the Tribune, in which the Administratrix sought permission to sell the Tribune to the Independent Publishing Company for $20,000, of which $12,500 would be payable in cash and the remainder would be represented by notes secured by a chattel mortgage. The court approved the sale. The Publishing Company issued its notes for the $7500 and executed and delivered a chattel mortgage to secure their payment. This mortgage was recorded in the office of which Taylor was the Clerk, and, in August 1927, the notes having been then paid in full, he endorsed the satisfaction upon the record of the mortgage in his office in his own handwriting.

In 1925, the Anderson Independent and the Anderson Tribune were combined into a single newspaper.

The taxpayer contends that the Tribune had been purchased for him by Hall as his agent, and that he remained the individual owner of the Tribune, notwithstanding the fact that it had been combined with the Independent, until stock of the Independent Publishing Company was issued to him in 1927, or, at least, until the fall of 1925 when he undertook to effect certain changes in the corporate charter of the Independ·

ent Publishing Company. His purpose is to establish a taxable transaction in the fall of 1925, or in 1927, upon which he could found a claim to a stepped-up basis for his stock. He says that, after he put up the $12,500, it was understood that Hall would pay the notes aggregating $7500, and, then, when he had done so, each of the two would own a half interest in the combined newspaper. He asserts a valuation of a half interest in the combined newspaper in the fall of 1925, or in 1927, substantially greater than the actual cost of the Tribune in 1925.

Under these circumstances, we think the finding of the Tax Court that the Tribune was purchased by the Independent Publishing Company, and that the $12,500 paid by the taxpayer to Hall was a payment upon the subscription price of his stock in the Independent Publishing Company [1] is adequately supported. Hall testified that he transferred the Independent to the Publishing Company about the time of the acquisition of the Tribune, and he was principally interested in the acquisition of the Tribune because of the Associated Press franchise, and that the agreement was that, upon Taylor's paying in $12,500, the two would become equal owners of the shares of the Publishing Company. His testimony is supported by Taylor's concern over the provisions of the charter of the Publishing Company and the elimination of a recital indicating that Morris was a stockholder. Indeed, when writing to the Secretary of State in 1925, Taylor said, "Immediately after the charter was issued I became connected with the paper as a stockholder * * *." He explained he wanted the reference to Morris as a stockholder eliminated to avoid any question as to ownership of the stock. Hall's testimony is confirmed by the fact that the Publishing Company gave its notes for the deferred portion of the purchase price of the Tribune and secured them by a chattel mortgage upon assets which theretofore had belonged to the Tribune. Mr. Taylor, as Clerk of the Court, in whose office the mortgage was recorded, must have been aware of it, and he personally endorsed the record of its cancellation upon its face in 1927. There is no evidence that he then made any contention that he, individually, rather than the Publishing Company, was the owner of the assets covered by the chattel mortgage.

Against all of this, the taxpayer points to the fact that minutes of meetings of the directors of the Publishing Company, prior to 1927, recited that Hall and Morris were the sole stockholders and the only directors, though this is inconsistent with Taylor's own declaration in the letter he wrote to the Secretary of State in 1925. In 1927, the minutes indicate that Morris resigned as a director and as secretary, and that an employee of the Publishing Company was elected to both offices in his stead.

There is no evidence that Morris ever paid anything into the Publishing Company. No stock was ever issued in his name. He was one of its corporators, and, with Hall, was originally elected to its board of directors. The fact that he did not resign until 1927, two years after the acquisition of the two newspapers, and the fact that, in the meanwhile, minutes of the directors' meetings referred to him as a stockholder and made no mention of Mr. Taylor, are not necessarily conclusive. It was clear that Taylor left the operation of the newspaper entirely to Hall. Taylor testified that he thought he had been a member of the Board of Directors of the Publishing Company from the time of his acquisition of fifty per cent of the stock, either in 1925 or 1927, until sometime shortly prior to 1951, but he never attended a meeting of the directors or of the stockholders

---

1. At about this time, Taylor had advanced other sums to Hall, approximating $2500. On the basis of a concession by the Commissioner, the Tax Court treated this as a contribution to the capital of Independent Publishing Company, giving the taxpayer a cost basis of $15,000, rather than the $12,500 advanced specifically for use in making the down payment on the purchase price of the Tribune.

during all of that time. That he did not do so in the two-year period, 1925–1927, is entirely consistent with his subsequent conduct. The references prior to 1927 to Morris as a stockholder, and the absence of any reference in formal minutes to Taylor as a stockholder during that period, did not require the Tax Court to reject all of the substantial evidence that the Publishing Company was, in fact, the purchaser of the Tribune in 1925, and that the only interest that Taylor had, or could have had, in the newspapers was as a stockholder of the Publishing Company.

### The Sales Price

In 1951, Taylor and Hall, having become embroiled in controversy, settled their differences by an agreement providing that Taylor would sell his stock in the Publishing Company for $420,000 in cash, and that each of the parties concerned, including the Publishing Company, would release every other party from every claim then existing. At that time the Publishing Company had on its books a receivable from Taylor amounting to $12,130.12. This was a remnant of an account which had been running for some years, arising out of the fact that the Publishing Company paid certain personal expenses for Hall and for Taylor, and at times, Taylor and Hall received merchandise from debtors of the Publishing Company, the value of which was credited to the debtors by the Publishing Company. Taylor knew of this account, though he testified that he did not think of it at the time of the settlement, did not know its amount, and did not know it would be cancelled on the books of the company. When the Publishing Company released Taylor from all claims it had against him, however, it was required to cancel the receivable it carried on its books. The entries on its books disclosed it paid $420,000 in cash to Taylor for the stock and the cancellation of the receivable was recorded as an additional part of the purchase price of the treasury stock.

Under these circumstances, we think the fact that Taylor did not consciously think about this matter at the time of settlement was immaterial, for the release, which was delivered, required the Publishing Company to cancel the indebtedness. It did so on the same day it recorded the payment of $420,000 to Taylor, the two items being recorded as part of the same transaction resulting in the redemption of fifty per cent of its stock. The Commissioner properly treated the amount of the canceled receivable as additional consideration for Taylor's stock.

### The Allocation of a Portion of the Purchase Price to Undistributed Profits of the Radio Station

In 1930, the Independent Publishing Company sought a permit to construct and operate a radio station in Anderson. After a hearing, that application was denied. In 1934, Hall acquired certain engineering studies from an individual applicant for a radio station in Anderson, and, thereupon, applied in his own name for a permit to construct and operate a radio station in Anderson. In connection with the application, he represented to the Federal Communications Commission that the Publishing Company would purchase as much of the time of the radio station as was required to assure financially satisfactory operation of the radio station. This application was granted by the Federal Communications Commission in 1935, and, thereafter, a radio station was constructed and was operated in Hall's individual name.

At the time the Federal Communications Commission was considering and acting upon Hall's application, Taylor was a member of Congress. He testified that it was well understood between Hall and him that the two were equal partners in the radio venture, but he, because of his office, was to be a secret partner. Beginning in 1944, Taylor began to write to Hall, asking ever more insistently that Hall take appropriate steps to make Taylor's interest in the radio sta-

tion a matter of record. Apparently, the two had discussed the formation of a separate corporation to operate the radio station, or the transfer of the assets of the radio station to the Publishing Company. Hall's responses to Taylor's demands were equivocal. They refer to problems of corporate taxes and to undisclosed problems and details which were being considered by accountants and by an attorney in Washington. He repeatedly expressed the hope that the entire matter soon would be worked out upon a satisfactory basis.

Hall testified that Taylor had never had an interest in the radio station. He said the two had discussed a purchase by Taylor of a half interest in the radio station, that Taylor's requests that his interest be made a matter of record and Hall's responses, referring to taxes and other unspecified problems, were all related to a proposed purchase rather than to the recording, or the acknowledgement, of a present interest owned by Taylor in the radio station.

It was the matter of the radio station which, apparently, brought the parties into controversy. In December 1950, Taylor filed two suits in the Court of Common Pleas for Anderson County. In one, he named as defendants the Independent Publishing Company, Hall, and Bessie P. McDaniel, the nominal holder of one share of stock of the Publishing Company. He sought a liquidation of the Publishing Company, an accounting by Hall for all of its earnings, and the interim appointment of a receiver. In the other action, in which Hall was the sole defendant, Taylor sought a declaration that he was the owner of a one-half interest in the radio station, an accounting by Hall for all of the profits of the radio station, a judgment against Hall for Taylor's share of profits earned, and the interim appointment of a receiver to operate the radio station.

These suits were pending, untried, when, in 1951, the parties agreed to settle their differences. As we have indicated, the agreement was that Taylor should sell his stock in the Publishing Company for $420,000 in cash, and that each of the parties in the legal actions should release every other party from all claims. Nothing was allocated specifically, or generally, to the settlement of Taylor's claim to a one-half interest in the radio station, though the settlement and the release were intended to, and did, dispose of that claim.

Solely for the purpose of computing fees payable to his own attorneys, Taylor and his attorneys allocated $95,000 of the $420,000 to the settlement of the suit involving the radio station. Taylor estimated that fifteen, or twenty, per cent of that amount should represent his interest in undistributed profits. Hall also testified that undistributed profits of the radio station would exceed $40,000. The taxpayer, therefore, after his return was investigated, sought to allocate $20,000 of the purchase price of the stock to a distribution to him of his share of undistributed radio station earnings, taxable as normal income, against which he could take a deduction for South Carolina income taxes paid in 1951.

We think the Commissioner properly disallowed this attempted allocation. In the settlement, the parties allocated nothing specifically to the settlement of the suit involving the radio station. The $420,000 was said to have been paid to Taylor for the stock he owned in the Publishing Company. In preparing his income tax return, Taylor reported that the consideration for the $420,000 was his transfer of the stock in the Publishing Company. Since nothing specifically was allocated as having been paid in compromise of Taylor's claim to be a half owner of the radio station, the Commissioner was not required to accept Taylor's belated allocation, which presupposes full recognition of his entire claim with respect to the radio station operation.

We do not think the Commissioner was required to allocate any amount to the radio station claim and to attribute a portion of that to a collection by Taylor of undistributed radio station profits, and hence to the realization of ordinary

income. While it is plain that Taylor claimed a half interest in the radio station, he did not claim that he, individually, had ever contributed any money, or thing of value, to it. His evident theory was that the radio station was an outgrowth of the Publishing Company business, and the Publishing Company had financed the radio station. If he established that premise, however, it would not necessarily follow that Hall and Taylor, as individuals, were the owners of the radio station. Proof of the premise might establish only that Hall was a trustee of a resulting trust for the benefit of the Publishing Company. In any event, when the parties came to compromise their differences, they were not bound by Taylor's assertion of a claim to be an owner, directly, of a half interest in the radio station. They could treat with each other and settle the matter on the basis of the assertion of a claim as an indirect owner, through the Publishing Company, of a half interest in the radio station. Evidently, this is exactly what they did, for they settled the entire controversy by a sale by Taylor of his stock in the Publishing Company, and the Publishing Company paid the entire cost of the settlement. Certainly, we cannot say that the Tax Court was clearly wrong when it declined to require the Commissioner to allocate anything to a direct collection by Taylor of undistributed net profits of the radio station.

### State Income Tax

■ In 1951, Taylor filed a tentative income tax return for that year with the State of South Carolina. This return disclosed an income tax liability of $15,-650, which he paid in 1951, and which he sought to deduct upon his federal income tax return for that year. As it developed, however, since the taxpayers had no net normal income, subject to normal taxes in 1951, before taking into account the allowable deduction for South Carolina income taxes paid, a deduction taken under § 23 of the Internal Revenue Code

of 1939, 26 U.S.C.A. § 23, was wholly worthless to the taxpayer. When the Commissioner undertook to recompute the gain upon the sale of the stock of the Publishing Company, therefore, the taxpayers contended that they should be allowed to treat the South Carolina income taxes, attributable entirely to the gain realized upon the sale of the stock since they had no other net income subject to state income taxes, as an expense of the sale. They assert that business people customarily think of resulting state and federal income taxes as an expense of the sale when gain is to be realized, and that it is inequitable not to allow the taxpayer here to treat state income taxes [2] as an expense of the sale, deductible in computing the gain.

The taxpayer is unable to cite any authority in support of his contention, and we find none.

When gain is realized in a capital transaction, the assessment of income taxes may be inevitable, in a sense, but resulting income taxes are highly contingent. Other unrelated transactions resulting in capital losses can reduce, or obliterate, the contingent liability. Income taxes are imposed upon realized gain, not upon realized gain diminished by the amount of such taxes which ultimately may be found attributable to the realized gain.

As the Tax Court observed, § 113(b) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 113(b) (1) is controlling or analogous. That section permitted a taxpayer to adjust his basis of capital assets for items properly chargeable to capital. The statute provides, however, that no such adjustment shall be made for taxes for which the taxpayer has taken deductions in that or prior taxable years. The amplifying regulations [3] specifically list those taxes which may be capitalized under § 113(b) (1) (A). Income taxes may not be capitalized. It is true that the taxpayer here is not attempting to increase his basis, as such,

---

2. He does not ask that federal income taxes be similarly treated.

3. Section 29.24-5, Treasury Regulations 111.

by virtue of the payment, after the sale, of South Carolina income taxes. He seeks to achieve its capitalization on a different theory, that it is a cost of sale, rather than an adjustment of basis. However, it seems clear that income taxes are an expense which cannot be capitalized either as an adjustment to basis, or as an expense of the sale out of which the contingent income tax obligation arose.

We find no error in the Tax Court's findings or its conclusions.

Affirmed.