Robert B. Riss and Georgina Riss v. Commissioner.
Riss v. Commissioner
Docket No. 3793-62.
United States Tax Court
T.C. Memo 1964-308; 1964 Tax Ct. Memo LEXIS 31; 23 T.C.M. (CCH) 1899; T.C.M. (RIA) 64308; November 25, 1964
Robert L. Jackson, City National Bank Bldg., Kansas City, Mo., for the petitioners. Allan B. Muchin, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in petitioners' income taxes: Year
Deficiency
1957
$160,948.60
1958
396.52
1959
5,512.73
1960
4,308.90
Petitioners did not contest the correctness of certain adjustments at the trial of this case. Consequently, we consider such issues abandoned. This leaves as the principal remaining issue the question of whether gain from the sale of stock in the Astor-Broadway Holding Corporation was properly *32 reported by petitioners as an installment sale under the provisions of section 453, Internal Revenue Code of 1954. An ancillary issue, raised in the alternative by petitioners, concerns the fair market value in 1957 of an installment note in the face amount of $1,100,000 received by the Riss family pursuant to the sale. Findings of Fact Some of the facts are stipulated and are found accordingly. Robert B. Riss (hereinafter called petitioner) and Georgina Riss are husband and wife residing at 2435 Drury Lane, Shawnee Mission, Kansas. They filed their joint Federal income tax returns for the years 1957, 1958, 1959, and 1960 with the district director of internal revenue at Wichita, Kansas. They used the cash method of accounting. Petitioner is president of Riss & Company, Inc., an interstate motor carrier. He is an officer and director in a number of other firms and owns substantial real estate properties as well. The Astor-Broadway Holding Corporation (hereinafter sometimes called Astor) was formed by David Rapoport and Harris J. Klein, real estate investors of many years' experience in the New York City area, who owned all the outstanding shares of *33 stock in such corporation. Their purpose in forming Astor was to acquire and develop certain properties then owned by John A. Wanamaker, Inc., a department store corporation with its principal operations in New York City. Those interests included the two buildings at 770 and 780 Broadway that housed the Wanamaker Department Store prior to May 1955, and a storage warehouse at 426 Lafayette Street. Title was held by the A. T. Stewart Realty Company, a wholly-owned subsidiary of Wanamakers. In order to acquire financial backing, Rapoport and Klein presented the venture to petitioner and his father, Richard R. Riss, Sr. On April 21, 1955, petitioner and his father entered into a partnership agreement with Klein and Rapoport for the purpose of operating the Astor-Broadway Corporation. On May 2, 1955, the Risses purchased one-half of Astor's 200 outstanding shares of common stock. That same day Astor entered into an agreement with the A. T. Stewart Realty Company for the purchase of the real estate and leasehold interests. The property included (1) the fee simple in the land and warehouse located at 426 Lafayette Street and (2) a leasehold interest in each of two buildings located at *34 770 Broadway (the "South" building) and 780 Broadway (the "North" building). The sales price paid by Astor was $5,806,451.60, of which $1,056,451.60 was paid in cash. Mortgages totaling $4,750,000 were given to the sellers as follows: $825,000 first mortgage on the warehouse and the remaining $3,925,000 on the leaseholds of the North and South buildings. Immediately after the purchase, the leaseholds on the North and South buildings and the right to operate the warehouse were transferred to the Klein-Rapoport-Riss partnership. This partnership operated the buildings, maintaining books and records and reporting their operation as a partnership for income tax purposes. The warehouse was rented to various tenants and immediately began to show a profit. The North building was deemed worthless by Rapoport and was demolished on his authority. The vacant lot was then temporarily rented to a parking lot operator. By an agreement dated October 1, 1956, this leasehold was released from the mortgage held by A. T. Stewart Realty Company. The partners decided that the South building could be converted into a profitable office building if extensive remodeling was done. To finance these *35 improvements the partnership sought additional financing. A second mortgage was placed on the warehouse in the amount of $385,000. At the insistence of creditors the assets of the partnership were returned to Astor and the Klein-Rapoport-Riss operating partnership was dissolved. From its inception on April 21, 1955, to its dissolution on July 11, 1956, the partnership sustained losses of $1,058,992.81. The losses were reported in the Federal income tax returns of the partnership for both 1955 and 1956. As a result of these operating deficits, petitioner and his father each owed the partnership $127,248.20. In reacquiring the assets of the partnership Astor also acquired the obligations of the partners to make up these deficits in capital. The amounts were recorded on Astor's books as accounts receivable. Both petitioner and his father were thus obligated to the corporation in the sum of $127,248.20 each. On July 11, 1956, when the partnership was terminated, petitioner's sister, Louise V. Riss, acquired a one-third interest in the investment then held by her father and petitioner. Thereafter, the Risses each owned an undivided one-third of 100 shares of Astor stock, or 33 1/3 shares *36 each, or one-sixth of the total authorized and outstanding stock. Because differences of opinion arose as to how the properties should be managed, the Risses decided to withdraw from the venture late in 1956. On January 18, 1957, the Risses entered into an agreement for the sale of their stock to Astor, receiving the following consideration: Cash down payment
$ 424,000.00
Installment note
1,100,000.00
Cancellation of indebtedness
254,496.40
Total sales price
$1,778,496.40
The sales agreement provided, in part, that the consideration for the stock included: * * * $254,496.40 by Astor, releasing Riss from their obligation to pay Astor the sum of $254,496.40 as it appears on the books of Astor, and by Astor's executing and delivering to Riss a general release in the usual form of all claims, if any, of Astor against Riss. Pursuant to this agreement, Astor executed a general release. In addition, Rapoport and Klein executed such releases individually. The transaction was recorded on the books of Astor and the $254,496.40 was cancelled in 1957. The Risses received the following consideration in partial payment for their stock in 1957: Cash down payment
$424,000.00
Cash - seven monthly pay-
ments on the note
58,333.31
Cancellation of indebtedness
254,496.40
$736,829.71
*37 The installment note was secured by a third mortgage of $500,000 on the warehouse and by the individual guaranties of Rapoport and Klein of $250,000 each. Finally, as an undertaking of Astor, this note was a general obligation secured by the assets of the corporation. It provided for monthly payments of $8,333.33 beginning June 1, 1957. It bore interest at 6 percent and was to run for 11 years. The Risses reported the following gain in their income tax return for 1957: Total sales price
$1,778,496.40
Less sales expenses
6,443.43
Net sales price
$1,772,052.97
Less adjusted basis of stock
26,650.00
Gain on sale
$1,745,402.97
As of January 17, 1957, Astor's only investment in the property at 780 Broadway was a lease thereon expiring October 1, 1984. Respondent's expert witness valued the warehouse at $1,500,000. Petitioner's expert valued it at $1,440,000. Rapoport refused an offer to sell of $1,500,000. Respondent's expert witness estimated that the South building and leasehold were worth $10,000,000, using various methods of valuation. Petitioner's expert, in projecting the value of the building upon the expected income of the property, arrived at *38 a value of $9,980,000. Petitioner has admitted that as of January 17, 1957, the building was partially remodeled and about 75 percent leased. As of that date, the following firms had rented space in the building: Lessee
Floor Rented
National City Bank
3
Recordak Corporation
4 and 5
Atlantic Mutual Insurance Co.
6 and half of 7
Chemical Corn Exchange Bank
Half of 7 and 8
Insurance Company of North
America
9 and 10
Chase Manhattan Bank
11, 12 and 13
On November 30, 1956, Astor had the following liabilities: Mortgages payable
$4,922,199.34
Notes payable
2,324,942.83
Accounts payable
1,030,986.83
Taxes payable
116,360.87
Deposits and securities payable
34,000.00
Wages payable
3,590.57
Advances payable
785,400.00
Accrued expenses
94,262.97
$9,311,743.41 These liabilities were not materially changed as of January 17, 1957. At the time it purchased the Risses' stock Astor-Broadway Holding Corporation was solvent. It had sufficient net worth to cancel the Risses' indebtedness and pay the $1,100,000 installment obligation. The $1,100,000 installment note, with its existing security, did not have a fair market value equal *39 to the face amount. The note could have been sold at an annual discount of 2 percent, or 22 percent off the face value. Ultimate Findings The debt owed by the Risses to Astor was cancelled in 1957 and must be included in the amount of payments received by petitioners in 1957. The payments received by the Risses in 1957 exceeded 30 percent of the selling price of the Astor stock. The fair market value of the $1,100,000 installment note in 1957 was $858,000. Opinion Petitioner is entitled to report his gain on the sale of his stock to the Astor-Broadway Holding Corporation as an installment sale under section 453, [1] Internal Revenue Code of 1954, if the "payments" he received in the taxable year 1957 did not exceed 30 percent of the selling price of the stock. Respondent contends that the receipt by the Risses in 1957 of cash in the amount of $482,333.31 plus the cancellation of $254,496.40 of indebtedness exceeds 30 percent of the total selling price of $1,778,496.40, thus precluding petitioner from using the installment method. Petitioner, on the other hand, asserts that Astor's cancellation of his indebtedness "was not the delivery of cash or its *40 equivalent during 1957." It can hardly be disputed that the indebtedness was cancelled in 1957. This fact is established by the express provisions of the agreement of sale and actual releases of the debt by Astor-Broadway and by Rapoport and Klein. Nothing more was required to make the cancellation of the indebtedness final in 1957. That being so, the amount of the indebtedness cancelled was income to the vendor and the equivalent of cash. W. H. Batcheller, 19 B.T.A. 1050 (1930). Cf. James Hammond, 1 T.C. 198 (1942), and Taylor v. Commissioner, 298 F. 2d 198 (C.A. 4, 1962). Therefore, the cancellation of the indebtedness constituted part of the "payment" received in 1957. *41 Petitioner maintains that Astor was insolvent and thus had no legal right to preferentially cancel his debt. From this premise he argues that Astor's creditors could look to him for payment of their claims to the extent of his share of such indebtedness. He relies on the provisions of section 15, New York Stock Corporation Law. In short, we think there is no merit to this position for two reasons: (1) There has been no showing that Astor refused to pay any of its obligations when due and (2) Astor was not insolvent, a fact which we have found from the evidence adduced. Next petitioner asks us to find that the $1,100,000 installment note given to the Risses by Astor had no determinable value on January 17, 1957, because it was an insufficiently secured obligation of an insolvent corporation and hence impossible to value accurately. This position, too, is unsupportable. It also turns on the financial condition of Astor during early 1957. We reiterate that in our opinion Astor was solvent and fully capable of meeting its obligations. The fair market value of Astor's business properties is not a fact which we must find with precision. We need not determine that they were worth any *42 given amount. We need only find, as we have done, that their value was sufficiently above the amount of outstanding liabilities to render the installment note given the Risses marketable at the 22 percent discount rate. It is our view that the evidence herein shows that the installment note had a fair market value of $858,000 in 1957. Decision will be entered under Rule 50. Footnotes
1. SEC. 453. INSTALLMENT METHOD. (b) Sales of Realty and Casual Sales of Personalty. - * * *
(2) Limitation. - Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1963 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition - * * *
(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.↩