360 F.2d 665
 William WELLS-LEE, James A. Yeoham and Velma Yeoham, Leslie E. Stiles and Avis V. Stiles, E. O. Martin and Dorothy Martin, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 18002.
 United States Court of Appeals Eighth Circuit.
 May 10, 1966.<CR>
 
 Page 667
 William C. Myers, Jr., Webb City, Mo., for petitioner.
 Martin T. Goldblum, Attorney, Tax Div., Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., and Lee A. Jackson and Harry Baum, Attorneys, Dept. of Justice, Washington, D. C., for respondent.
 
 
 1
 Before MATTHES and GIBSON, Circuit Judges, and LARSON, District Judge.
 
 
 2
 LARSON, District Judge.
 
 
 3
 Petitioners William Wells-Lee, James A. Yeoham, Leslie E. Stiles, and Edward O. Martin seek review of an adverse decision of the Tax Court.[1] Osteopathic physicians and surgeons practicing in Joplin and Southwest Missouri, petitioners paid various amounts to the Tri-State Osteopathic Hospital Association during the years 1959, 1960 and 1961. These payments were deducted as ordinary and necessary business expenses but respondent Commissioner disallowed the deductions and determined deficiencies in petitioners' income tax for the years in question. The Tax Court upheld the Commissioner in this respect.[2]
 
 
 4
 The facts are essentially undisputed. Petitioners and other osteopathic doctors encountered difficulty in using hospitals in the area of their practice. Thus, in June, 1958, an unincorporated organization was formed, known as the Tri-State Osteopathic Hospital Association (Association) for the purpose of acquiring hospital facilities for osteopaths. Petitioners and other persons made contributions to the Association. About six months later, on January 15, 1959, Tri-State Osteopathic Hospital Association (Tri-State) was incorporated under Missouri law as an exempt charitable corporation. The Association's assets were turned over to Tri-State. The Tax Court found that the immediate purpose of Tri-State was to acquire Joplin General Hospital for use by osteopathic doctors, with the additional objective of constructing a new hospital. On June 10, 1959, Tri-State acquired all the outstanding stock of Joplin General Hospital, Inc., a Missouri corporation. Thereafter, and up until September 17, 1963, Tri-State operated Joplin General pursuant to a lease from the Joplin corporation at an annual rental of $1.00. Joplin General was in need of repairs and the State of Missouri threatened to close it unless improvements were made. In June, 1961, Tri-State initiated plans to build a new hospital and on September 17, 1963, Joplin General was closed and a new and larger facility, Oak Hill Hospital, was opened.
 
 
 5
 Under the by-laws of Tri-State, the hospital was managed by a Board of Directors. Although no osteopath ever served as an officer or director, the professional staff was permitted to nominate persons for election to the Board, and the Chief of Staff regularly attended Board meetings. The Tri-State osteopaths had to reapply each year for staff privileges. After an application was submitted to the professional staff, it was transmitted to the Board with a recommendation, but no application was ever rejected.
 
 
 6
 The Tri-State doctors paid a staff fee and it is these payments which are in question here. Shortly after the incorporation of Tri-State in 1959, petitioners, along with other osteopaths, signed a memorandum agreement which stated that they supported the efforts of Tri-State to acquire Joplin General and to build a new hospital. By signing this memorandum petitioners agreed (1) to join the staff of Joplin General; (2) to pay a staff fee of $2,000 for the use of Joplin General; and (3) to pay a prorata share, up to $1,000 per year and subject to a total maximum of $3,000, to satisfy any default under Tri-State's contract to purchase Joplin General. None of the petitioners, or any other doctor, was called upon to make the latter payments.
 
 
 7
 This agreement was signed prior to June 9, 1959, and the $2,000 staff fee was the subject of action by the Board of Directors at its meeting on June 16, 1959. The minutes of that meeting indicate the Board unanimously resolved that the staff fee be $2,000, payable in cash or by a promissory note, on terms and conditions agreeable to the hospital administrator and the Board of Directors.
 
 
 8
 Each of petitioners paid $2,000 as a staff fee, and petitioners Yeoham, Stiles and Martin paid some additional amounts in excess of $2,000.[3] The Tax Court found that petitioners' purpose in making these payments was to secure hospital facilities. It was also found that the payments were deposited to the general fund and were used for the hospital's operation. The Court also made findings that (1) the use of a hospital was essential to petitioners' osteopathic practice; (2) petitioners received substantial income as a result of the services they performed at the hospital; (3) that petitioners have practiced in Tri-State's two hospitals continuously from 1959 to the time of trial; and (4) that none of petitioners paid any additional staff fee for use of the new Oak Hill Hospital.
 
 
 9
 The Tax Court considered the $2,000 staff fee and the additional amounts as distinct items and held: (1) that the staff fee was not currently deductible as an ordinary and necessary business expense, but was a capital item; (2) that the staff fee could not be amortized since petitioners failed to prove the privilege had a determinable economic life; (3) that the additional payments were voluntarily made, and were not deductible as ordinary and necessary business expenses.
 
 
 10
 Our assessment of the Tax Court's decision is governed by § 7482 (a), Internal Revenue Code of 1954, 26 U.S.C., which provides for review of decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried to a court without a jury." This means that the clearly erroneous standard of Rule 52, Fed.R.Civ.Proc., applies to review of questions of fact determined by the Tax Court. Lessmann v. Commissioner of Internal Revenue, 327 F.2d 990 (8th Cir. 1964); Banks v. Commissioner of Internal Revenue, 322 F.2d 530 (8th Cir. 1963). "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Thus if the findings here can be said to be supported by substantial evidence upon the record as a whole, and are not against the clear weight of the evidence, or induced by an erroneous conception of the law, they will not be disturbed. Sachs v. Commissioner of Internal Revenue, 277 F.2d 879 (8th Cir. 1960); Stevens Bros. Foundation, Inc. v. Commissioner of Internal Revenue, 324 F.2d 633 (8th Cir. 1963); Wisconsin Memorial Park Co. v. Commissioner of Internal Revenue, 255 F.2d 751 (7th Cir. 1958).
 
 
 11
 Section 162(a) of the Internal Revenue Code of 1954, 26 U.S.C. (Code), permits a taxpayer to deduct all the ordinary and necessary expenses incurred during the tax year in connection with a trade or business. Although the terms "ordinary and necessary" have been repeatedly construed and applied, no definite standard can be formulated for determining whether a claimed deduction can qualify as an expense ordinary and necessary in the particular taxpayer's business. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Iowa Southern Utilities Company v. Commissioner of Internal Revenue, 333 F.2d 382 (8th Cir. 1964). In general, a business expense is tested by its normalcy and soundness considered in light of the nature of the taxpayer's trade or business, Byers v. Commissioner of Internal Revenue, 199 F.2d 273 (8th Cir. 1952), but the determination of whether an expense is ordinary and necessary and the taxpayer's purpose in making a particular payment are usually questions of fact. General Bancshares Corporation v. Commissioner of Internal Revenue, 326 F.2d 712 (8th Cir. 1964). Where a deduction has been disallowed, the burden rests with the taxpayer to demonstrate that the Commissioner erred. Dyer v. Commissioner of Internal Revenue, 352 F.2d 948 (8th Cir. 1965); Green v. Bookwalter, 319 F.2d 631 (8th Cir. 1963).
 
 
 12
 Staff Fees —
 
 
 13
 In the present case there is no question that the amounts sought to be deducted were paid or incurred in the years 1959, 1960, and 1961. Nor is there any dispute that the payments were made in connection with a business activity. The Tax Court expressly found that "the use of a hospital was essential to petitioners in the practice of their profession," and that their purpose "in making payments to Tri-State was to secure the facilities of a hospital where they could bring and treat their patients and earn income." These findings, which are upheld by the record, support the view that the staff fee was a necessary expense for petitioners' profession. No express finding was made with respect to the requirement that business expenses be ordinary, but the Commissioner makes no claim here that the payments do not satisfy that requirement. Nonetheless, even if the staff fee was both ordinary and necessary, we agree with the Tax Court that the payments brought about the acquisition of a capital asset and thus they are not currently deductible.
 
 
 14
 Under the Code, ordinary and necessary business expenses are distinguished from capital expenses which, pursuant to § 263(a) (1), are non-deductible in the year of payment, but may be depreciated or amortized over the life of the asset in accordance with § 167. Hence, to obtain the business expense deduction of § 162(a) the taxpayer must meet the criteria contained in that section and, in addition, must show that the payment did not result in the acquisition of a capital asset with a life in excess of one year. General Bancshares Corporation v. Commissioner of Internal Revenue, supra. Petitioners argue that the Tax Court proceeded from the erroneous premise that the business expense deduction of § 162(a) was intended primarily for recurring items. They also find error in the Tax Court's conclusion that the hospital privileges secured by the staff fee represent a capital asset.
 
 
 15
 The Tax Court's decision was based primarily on Howard v. Commissioner, 39 T.C. 833 (1963). Taxpayers there were two osteopathic physicians and surgeons practicing in Albuquerque, where hospital facilities were inadequate or non-existent. In 1957 a group of osteopaths formed an association for the purpose of constructing a new hospital, which was opened some time in 1959. During 1958 and 1959 the taxpayers made payments to the association which they sought to deduct either as charitable contributions, or ordinary and necessary business expenses. The Tax Court ruled the payments were not deductible on either ground. All staff doctors were required to pay an equal amount to the association to become voting members and to acquire hospital privileges. Noting that the expense was not an annual item, the Court concluded that taxpayers obtained an asset with a useful life beyond the tax year, which precluded a current deduction under § 162(a).
 
 
 16
 Petitioners herein seek to distinguish Howard on several bases. One contention is that they received no asset as a result of paying the staff fee. Petitioners find it significant that payment of the fee was not a condition precedent to practicing in the Tri-State Hospital, as it was in Howard. Because some doctors practiced in the hospital and received identical privileges without full payment of the staff fee, petitioners conclude that their payments secured no benefit or advantage. This argument has no merit, as it is immaterial whether other taxpayers received the same asset or benefit without the necessity of payment.
 
 
 17
 While petitioners admit they received a "place to practice," it is contended that the benefits received by the osteopaths in Howard were greater than the privileges received here. Petitioners point out that in Howard the doctors were allowed to elect the hospital trustees, while they only had the right to nominate the directors of Tri-State Hospital; that the doctors in Howard received free locker space, which they did not. We agree with the Commissioner that these are differences without substance. The crucial factor is that the right to practice is an intangible benefit or advantage like a capital asset. Although the advantages in Howard may have been greater, the quantity of the benefit is not determinative.
 
 
 18
 It is further argued that since some of the payments in Howard were made before the hospital was opened, they could not have been expenses necessary to the production of income in the year of payment. This, too, petitioners contend is an important distinction, arguing that their payments afforded them a current place to practice. There is no doubt that in the years of payment petitioners obtained a place to practice which contributed measurably to the production of income. However, the record is also clear that the place to practice was available to them subsequent to the years in which the payments were made.
 
 
 19
 It is true, as petitioners argue, that a current deduction is not prohibited merely because an expense is nonrecurring. Welch v. Helvering, supra; Connecticut Light and Power Company v. United States, 299 F.2d 259, 156 Ct.Cl. 304 (1962); Rev.Rul. 56-359, Cum.Bull. 1956-2, 115. Nonetheless, when the expenditure is made only once, while the benefits continue, the possibility arises that the outlay was for a capital asset. Such cases are Mercantile National Bank at Dallas v. Commissioner, 30 T.C. 84 (1958); Tube Bar, Inc. v. Commissioner, 15 T.C. 922 (1950); and Grace National Bank of New York v. Commissioner, 15 T.C. 563 (1950), decisions relied upon by the Court below. The Mercantile Bank case involved payments by a corporate taxpayer for membership in the Dallas Athletic Club, which was used by a bank officer in connection with the business. The payments included an item for initiation fees, for a membership certificate, and for regular dues. Although the certificate could be redeemed upon termination of the membership, we do not agree with petitioners that this gave the taxpayer any more of an asset than they received. It was held that the initiation fees and the cost of the membership certificate were non-deductible under § 162(a), while the regular dues were deductible. The same result was reached in the Grace Bank case with respect to amounts expended by a taxpayer engaged in the banking business for membership in a clearing house association. The admission fee was payable only once, but the court noted that fee was distinguishble from periodic annual assessments which members of the association were called upon to pay for operating expenses. In Tube Bar the taxpayer spent large sums to acquire a liquor license which, although subject to renewal, was a privilege which the taxpayer would enjoy for years subsequent to that of payment. These cases illustrate the distinct tax treatment accorded to payments which can be allocated to the production of income in the current year and those which continue to aid the taxpayer in earning income over a number of years. If, in the instant case, it had been necessary for petitioners to pay a staff fee each year in order to continue receiving hospital privileges, the amounts would have been fully deductible in the year of payment, as the Commissioner concedes. Under the circumstances presented here, we conclude that the Tax Court's decision with respect to the staff fees was correct.
 
 
 20
 Additional Amounts —
 
 
 21
 Three of petitioners made payments to Tri-State in excess of the $2,000 staff fee. The Tax Court found these sums were voluntarily paid, but noted that the evidence did not clearly indicate the manner in which the hospital used these funds. The Tax Court was of the opinion that even if the payments were used to defray current operating expenses, they would not be ordinary and necessary expenses deductible by petitioners since the obligations satisfied thereby were not their own.
 
 
 22
 As petitioners maintain, the voluntary nature of a payment alone will not preclude its deductibility as an ordinary and necessary business expense. Waring Products Corporation v. Commissioner, 27 T.C. 921 (1957); Rev.Rul. 56-369, 1956 Cum.Bull. 115. Although it is generally true, as stated by the court below, that one taxpayer may not deduct as his business expense payments made to satisfy obligations of another taxpayer, such payments may become deductible if they protect or promote the payor taxpayer's business. Dinardo v. Commissioner, 22 T.C. 430 (1954). In the last cited case, the taxpayers were doctors practicing as a partnership. They organized a non-profit corporation to operate a private hospital at which they treated patients, the fees from such patients going to the partnership. During 1948 and 1949 the partnership paid the operating deficits of the hospital and deducted these sums as ordinary and necessary business expenses. Rejecting the Commissioner's contention that the payments were not necessary to the partnership business, the deduction was upheld. The Tax Court reasoned that while the expenditures kept the hospital operating, they were not designed to increase its profits, but rather to protect and preserve the fees which the medical partnership could earn from use of the hospital.
 
 
 23
 The situation of petitioners herein would be comparable, except that the Tax Court's opinion indicates that they failed to show the disposition which Tri-State made of their payments. Petitioners argue that the Court's conclusion is inconsistent with, and contrary to, its express finding that "the amounts paid by petitioners were deposited to the general fund of the hospital and used for its operation." While this finding does suggest that the additional payments, as well as the initial staff fee, kept Joplin General going, the Court's conclusion would suggest that the term "operation" was not used to indicate that the payments went for current operating expenses. The hospital bookkeeping records were not introduced, but testimony of the administrator indicates that some of the money was used to purchase additional equipment and install more bathrooms. One of the staff osteopaths testified that when additional payments were requested, he understood the money was to be used for an X-ray machine and other improvements. The administrator also testified in regard to the additional payments, "* * * I could see the writing on the wall that they were going to have to have more money to keep operating to put that place in a state to meet the state requirements." Even if the objective of purchasing additional equipment and making improvements was to forestall the threatened closing of the hospital by the State of Missouri, the payments would still be non-deductible under § 162 (a) since the benefit from these items would not be exhausted within the year of payment. Cf. RKO Theatres, Inc. v. United States, 163 F.Supp. 598, 143 Ct.Cl. 39 (1958); Hotel Sulgrave, Inc. v. Commissioner, 21 T.C. 619 (1954). While the record is scant, what evidence there is suggests that the additional payments went for improvements in the building or equipment. Under these circumstances, we must agree with the Tax Court that petitioners failed to satisfy their burden of proving a clear right to a current deduction.
 
 
 24
 Amortization —
 
 
 25
 Although capital expenditures may not be currently deducted, the Code permits a taxpayer to recover the cost of a capital asset through depreciation or amortization deductions spread over the useful life of the asset. Int. Rev.Code of 1954, § 167. An intangible asset, such as the staff privileges here, may be the subject of a depreciation allowance if it "is known from experience or other factors to be of use in the business * * * for only a limited period, the length of which can be estimated within reasonable accuracy." Treas.Reg. § 1.167(a)-3, 26 C.F.R.
 
 
 26
 In the Tax Court petitioners argued, alternatively, that if their payments were capital in nature, an amortization deduction spread over the life of Joplin General should be permitted. Reasoning that the payments to Tri-State secured the privilege of practicing in the new Oak Hill hospital as well, the Court rejected the life of Joplin General as the proper amortization period. Other depreciation periods were not considered on the ground that petitioners failed to adduce any evidence bearing on this issue.
 
 
 27
 Petitioners take issue with the statement in the Court's opinion that Tri-State's primary purpose was to construct a new hospital, arguing that it is not only against the weight of the evidence, but also contrary to the Court's express finding that the payments were "for the purpose of keeping Joplin General operating." In addition, it is contended that the Commissioner acted arbitrarily in denying any deduction to petitioners since another Tri-State doctor was permitted to amortize his payments over a two year period. Relying on the Howard decision, the Commissioner argues that the amortization deduction should be spread over the doctors' life expectancy, but contends this course is not available to petitioners because they failed to disclose their ages. The Commissioner points out that the two year depreciation period was applied to the other Tri-State doctor referred to by petitioners because he was seventy-two years of age.
 
 
 28
 We think the Commissioner's suggestion inapplicable to this case, in any event. The right to practice at Joplin General was not a privilege which gave petitioners an economic advantage for their full life expectancy. From the testimony in this case alone, it appears that a doctor may be on the staff of different hospitals during his life expectancy. Some of the petitioners indicated that before joining the staff at Joplin General they had staff privileges at another hospital, at which they also paid a staff fee. The benefit from that fee would be exhausted when they transferred to another hospital. Upon reviewing the record, we are convinced that the Tax Court erred in rejecting the life of Joplin General as the appropriate amortization period. Although petitioners did practice at Oak Hill without additional payment, all of the evidence supports the finding that their purpose in expending the amounts in issue was to operate, and practice in, Joplin General. The agreement which they signed in 1959 obligated them to pay a staff fee for use of Joplin General. Testimony of a Board member also relates the fee to Joplin General.[4] The Commissioner points out that minutes of the Board in regard to the staff fee do not specify Joplin General, but refer to Tri-State Osteopathic Hospital. Nonetheless, when the staff fee was established, Tri-State had only one hospital — Joplin General. In addition, there is no showing that the staff fee carried over to Oak Hill. For instance, there is no evidence that a doctor who had not practiced at Joplin General was required to pay a staff fee before practicing at Oak Hill.[5] Although the record is not entirely clear, it seems that all the payments by petitioners were consumed in the operation of Joplin General. The hospital administrator testified that more money was spent to operate Joplin General than the doctors paid in.
 
 
 29
 Our review of the evidence leads us to conclude that petitioners should be permitted to amortize their payments over the life of Joplin General Hospital. This applies as well to the additional payments. Although those amounts went for equipment and other improvements, it seems that the useful life of these items terminated with Joplin General. The only testimony in the record, elicited by the Commissioner on cross-examination, was that "very little" of Joplin General's equipment was transferred to the new hospital.
 
 
 30
 The decision of the Tax Court is reversed with respect to the question of amortization, affirmed in all other respects, and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Joint returns were filed and the wives of three of the petitioners were also joined as parties
 
 
 [2]
 Other issues were considered by the Tax Court and decided in petitioners' favor. The Commissioner did not seek review of these rulings
 
 
 [3]
 The payments involved were as follows:
 Petitioner 1959 1960 1961
 Wells-Lee ............................... $2,000 $..... $.....
 Yeoham .................................. 2,000 2,000 1,000
 Stiles .................................. 1,150 850 1,500
 Martin .................................. 1,800 ...... 525
 
 
 [4]
 Mr. Roy Ford, called by the Commissioner, testified as follows:
 We needed money to acquire and properly equip the old hospital, which was to be the interim hospital until the new one could be built. In order to get this money, we were going to look for donations from businessmen and such around town. A more immediate source of money was to assess the doctors, and that we did, $2,000 per doctor.
 Transcript, p. 109.
 
 
 [5]
 The objective of the testimony of the Commissioner's witness Dr. Freeman was to establish that payment of the staff fee was a prerequisite to practicing in Joplin General. There was no attempt to relate the staff fee to Oak Hill, and the witness testified that his disagreement with the Chief of Staff concerning the fee occurred in July of 1963, which was prior to the opening of Oak Hill