**Robert B. RISS and Georgina Riss, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 8530.**

United States Court of Appeals
Tenth Circuit.

Nov. 10, 1966.

William B. Bundschu, Kansas City, Mo., for petitioners.

Thomas L. Stapleton, Attorney, Department of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Stephen H. Paley, Attorneys, Department of Justice, on the brief), for respondent.

Before PICKETT and SETH, Circuit Judges, and CHRISTENSEN, District Judge.

SETH, Circuit Judge.

This appeal concerns the installment method of reporting income under § 453 of the Internal Revenue Code of 1954. The petitioner-taxpayer,[1] Robert B. Riss, seeks reversal of the decision of the Tax Court holding that the taxpayer received in excess of thirty per cent of the sale price of certain corporate stock in the sale year of 1957, thus precluding the taxpayer's use of § 453 to report income from an installment sale on the installment method.

The facts, as stipulated or developed by the record, and about which there is no dispute, are simplified and summarized as follows:

In late 1954, David Rapoport and Harris Klein organized the Astor-Broadway

---

1. The taxpayer's wife, Georgina Riss, is apparently a party only because joint income tax returns were filed for the taxable years involved.

Holding Corporation (hereinafter referred to as Astor) for the purpose of acquiring certain property interests in New York City. Rapoport and Klein owned the outstanding stock of Astor. Astor contracted to acquire the following property: The fee to a warehouse at 426 Lafayette Street (the warehouse); leasehold interests in 770 Broadway (the South building) and 780 Broadway (the North building). The North and South buildings had once housed the Wanamaker Department Store, but the buildings were vacant when the contract was negotiated. The sale price of the property interests described above was $5,806,000, of which Astor was to initially pay in cash $1,057,000. Astor gave mortgages for the balance in the sums of $825,000 on the warehouse and $3,925,000 on the leasehold interests in the North and South buildings.

To secure funds for the initial cash payments of $1,057,000, Rapoport and Klein approached the taxpayer and his father (the Riss family). The Riss family agreed to provide funds, and in 1955 the Riss family entered into a fifty per cent partnership agreement with Rapoport and Klein. At the same time the Riss family also bought fifty per cent of Astor's outstanding stock. Immediately after Astor acquired the property interests the leaseholds on the North and South buildings and the right to operate the warehouse were transferred to the Riss family-Rapoport-Klein partnership; the partnership then leased the properties back to Astor for operation. The partnership was in the nature of a joint venture operating the properties through Astor.

During the term of the partnership, which was dissolved on July 11, 1956, the warehouse was profitably leased. The partners agreed that the South building could be profitable only if it were remodeled into an office building, and the partnership obtained financing and commenced remodeling. Prospective creditors insisted, however, that the properties be transferred back to Astor from the partnership, and this was done.

The partnership operated at a loss during its existence, and upon its termination in July 1956, the taxpayer and his father (together with Rapoport and Klein) were each liable to the partnership for his share of the book capital deficit in the sum of $127,000. The liabilities of the partnership were then nearly five million dollars. The Riss family's combined partnership liability of $254,000 for capital deficit was transferred to Astor's books as receivables when the partnership was dissolved and the property interests were transferred back to Astor.

The taxpayer's sister, Louise Riss, acquired a one-third interest in Astor's shares then held by the taxpayer and his father; thus the taxpayer, his sister, and his father each owned an undivided one-third interest in fifty per cent of Astor's outstanding stock after termination of the partnership.

Disagreement arose between the Riss family and Rapoport and Klein concerning the operation of Astor, and in January 1957 the Riss family agreed to sell their stock to Astor for $1,778,000, to be paid for by Astor as follows: Cash down payment, $424,000; installment obligation, $1,100,000; and cancellation by Astor of the Riss family's partnership indebtedness, $254,000. In 1957, the year of sale, the Riss family received the cash down payment and seven monthly installments on Astor's $1,100,000 obligation, a total of $482,000 in cash, which is less than thirty per cent of the sale price. But, as mentioned, Astor also agreed to cancel the Riss family's partnership indebtedness to it of $254,000. If the cancelled indebtedness is added to the cash received by the Riss family in 1957 the total payment received by the Riss family in the year of sale is $736,000, which exceeds thirty per cent of the sale price and prevents the taxpayer's use of § 453 to report income from an installment sale on the installment method.

Although "taxpayer" and "Riss family" are used interchangeably herein, it is understood that the individual taxpayer (and his wife) were taxed on only one-

third of the Riss family's gain on the stock sale to Astor.

The Tax Court held that cancellation by Astor of the Riss family's partnership indebtedness constituted part of the payment received in the year of sale; the correctness of this determination is the primary issue in this appeal.

Cancellation of a seller's indebtedness to the purchaser as partial consideration for the purchase has been held equivalent to receipt by the seller of that part of the sale price. See W. H. Batcheller, 19 B.T.A. 1050; James Hammond, 1 T.C. 198; Stephen A. Cisler, Jr., 39 T.C. 458; Taylor v. Commissioner of Internal Revenue, 298 F.2d 198 (4th Cir.); United States v. Hall, 307 F.2d 238 (10th Cir.); Newmark v. C. I. R., 311 F.2d 913 (2d Cir.). Similarly, assumption by a purchaser of the seller's obligation to third parties has been held equivalent to receipt by the seller of that part of the sale price. Burnet v. S. & L. Building Corp., 288 U.S. 406, 53 S.Ct. 428, 77 L.Ed. 861; Lucas v. Schneider, 47 F.2d 1006 (6th Cir.); Stephen A. Cisler, Jr., supra; James Hammond, supra; J. W. McWilliams, [Williams v. C. I. R.] 15 B.T.A. 329. "When a taxpayer's obligations are assumed by another or are reduced or canceled as part of a business transaction, and the taxpayer is thereby enriched, taxable income may result." 2 Mertens, Federal Income Taxation, § 11.-19 (rev. ed. 1961).

The taxpayer in the case at bar, however, contends that the Tax Court here erred by including the cancelled indebtedness as payments received in the sale year 1957 because (1) cancellation of the indebtedness by Astor, absent a novation, did not discharge the Riss family's contingent personal liability to creditors of the partnership, and (2) cancellation of the indebtedness was meaningless because Astor was insolvent and such cancellation was therefore prohibited by New York statutes.

■ Taxpayer's first point, that cancellation of the Riss family's indebtedness by Astor did not relieve the Risses of contingent personal liability to credi-

tors of the terminated partnership, is not disputed by the Commissioner. Taxpayer would then argue that cancellation of the indebtedness by Astor was ineffective for present purposes because Astor failed to secure releases from the partnership creditors for the benefit of the Riss family. Beyond stating that Astor agreed to cancel the Riss family's indebtedness as partial consideration for the stock, the sale contract does not recite an assumption by Astor of the Riss family's partnership liabilities.

The taxpayer's reliance on United States v. Marshall, 357 F.2d 294 (9th Cir.), which concerned the installment provisions of § 453, assumes that the parties or the Riss family considered that the cancellation of the indebtedness was in substance, although not in form, an unarticulated agreement by Astor to also assume the Riss family's partnership liabilities. In Marshall, the purchaser, as part of the consideration, expressly agreed to assume and pay certain obligations of the seller's proprietorship to third party creditors. The obligations assumed by the purchaser represented approximately twenty-two per cent of the sale price; the purchaser paid these obligations in the sale year. The seller in Marshall also received cash in the sale year representing approximately twelve per cent of the sale price, a total actual and constructive receipt of payments in excess of thirty per cent of the selling price. The Ninth Circuit, adopting the analogy of an assumption of a mortgage, affirmed the District Court's determination that the seller's obligations, assumed and paid by the purchaser, were improperly included in the percentage computation under § 453 as payments received in the year of sale.

Under the theory that Astor agreed to assume the Riss family's partnership liabilities the case at bar would be similar to Marshall. However there is nothing in the record upon which to base such a theory, and thus the mortgage exception is not here applicable. At the time of the 1957 sale of taxpayer's interest the record shows only a concern of the par-

ties with the debt—the accounts receivable on Astor's books which represented the old partnership capital deficit allocated to the Riss family. The debts of the terminated partnership are another matter entirely, and there is nothing in the record to show any consideration of them at the time of sale. Thus Astor's cancellation of the Riss family's indebtedness was precisely what the sale contract said it was—a cancellation and no more. The taxpayer concedes that there was indebtedness; the indebtedness was effectively cancelled when the sale contract was executed and when Astor, Rapoport, and Klein tendered releases to the Riss family dated January 18, 1957. Although the taxpayer has not explained when the indebtedness was cancelled if it were not cancelled upon execution of the sale contract, it seems the taxpayer's theory is that the cancellation was only effective pro rata; that is, the debt was effectively cancelled only as Astor actually paid the creditors of the partnership. If this were so the taxpayer would still fail to meet the thirty per cent restriction of § 453. The taxpayer has not referred us to any authority wherein residual contingent personal liability would, under the facts in the case at bar, operate to exclude the cancelled indebtedness from inclusion as payments received in the year of sale under § 453, nor have we been able to find such authority.

The taxpayer has thus failed to show that the cancellation of indebtedness did not result in taxable income to him in the year of sale. Newmark v. Commissioner of Internal Revenue, 311 F.2d 913 (2d Cir.). We believe the Tax Court correctly held that the indebtedness was effectively cancelled in the year of sale and that the amount of cancelled indebtedness was equivalent to payments received in the year of sale.[2] See W. H. Batcheller, supra; James Hammond, supra; Stephen A. Cisler, Jr., supra; Taylor v. Commissioner of Internal Revenue, supra; United States v. Hall, supra; Newmark v. Commissioner of Internal Revenue, supra.

A second argument urged by the taxpayer against inclusion of the cancelled indebtedness as payments received in the year of sale is that Astor was insolvent when the sale contract was executed. The taxpayer cites New York statutes that prohibit and invalidate preferential transfers by an insolvent corporation for the benefit of particular creditors, and which make it a misdemeanor for any director or officer of a corporation to concur in application of corporate funds, except for surplus, toward the purchase of the corporation's stock, unless permitted by law. N.Y.Stock Corporation Law, McKinney's Consol.Laws, c. 59, § 15; N.Y.Penal Law, McKinney's Consol.Laws, c. 40, § 664.

By first asserting the insolvency of Astor and then invoking the New York statutes, which could have been used to invalidate the entire transaction, the taxpayer is attacking the release and also pursuing his theory of contingent personal liability on another tack. The New York statutes cited above are however clearly designed for the protection of creditors; they are not designed to control the determination of income tax consequences of a particular sales transaction between the shareholders *inter se* and the corporation. We are concerned here with the application of specific provisions of the Internal Revenue Code to the taxpayer under § 453. The record discloses that the taxpayer had knowledge of these statutory restrictions when the contract was executed; the record discloses that the taxpayer was advised that personal liability might accrue to him if the statutes had been violated to the detriment of creditors; the record discloses that the taxpayer has enjoyed the full benefits of the sale contract; and the record discloses that no creditor of Astor has brought suit against the taxpayer, the Riss family, or Astor to void the transaction and recover the sale

**2.** Although the taxpayer argues that the cancellation of indebtedness was ineffective, he would nevertheless include that amount in the sale price to determine if more than 30% of the sale price were received in the year of sale.

price of $1,778,000, nor the cash portion thereof which was paid initially. The Tax Court specifically found that Astor was not insolvent when the sale contract was executed, but assuming arguendo that Astor was insolvent, the statutes cited give creditors a cause of action and do not necessarily determine the issues here. The contingency of a creditor's action and resulting personal liability to the taxpayer infects the entire stock transaction, not merely the cancellation of the Riss family's indebtedness to Astor. In this context, the cancellation of indebtedness is indistinguishable in form or substance from the cash received by the taxpayer in the first year, or in any year thereafter; the rights of creditors are harmed as much by distribution of cash as by cancellation of accounts receivable.

We find no error in the Tax Court's inclusion of the cancelled indebtedness as part of the payment received in the year of sale under § 453.

Because the taxpayer has failed to meet the requirements of § 453 for reporting gain on the sale by the installment method, he must treat the sale as a deferred payment transaction. For the purpose of determining taxable gain on the transaction, Astor's contract to pay the Riss family $1,100,000 in monthly installments for eleven years must be assigned a fair market value at the time of sale. If Astor's $1,100,000 obligation had no market value, then payments received by the taxpayer would be reported and taxed in the year in which they were actually received. See Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143; Miller v. United States, 235 F.2d 553 (6th Cir.).

In the case at bar, the Tax Court found that Astor's obligation had a fair market value of $858,000 in 1957. This value was determined by discounting the face value of the obligation by two per cent per year for the term of the installment obligation, eleven years. The stock sold to Astor by the Riss family had a basis of $26,000, and Astor paid $100,000 in cash when the contract was executed.

Unlike the facts in Burnet v. Logan, supra, the case at bar does not disclose a situation in which the Riss family might never recover its capital investment.

To understand the taxpayer's contention that the installment obligation was not susceptible to a determination of fair market value in the year of sale, it is necessary to describe briefly the details of Astor's obligation and to relate additional facts. Although Astor's $1,100,000 obligation was not in the form of a note, it was a contractual obligation of the corporation; therefore, it is referred to herein as an "installment obligation" of Astor to pay $1,100,000 to the Riss family. By the terms of the sale contract of January 1957, Astor secured payment of the installment obligation with a third mortgage in the sum of $500,000 on the warehouse. Rapoport and Klein each executed their personal guarantee for $250,000 as additional security. The sale contract also recites that Astor was negotiating to sell the leasehold on the South building for $5,000,000 or more. Astor would then enter into a sublease with the purchaser to operate the South building (the remodeled office building) for an annual rental not to exceed $500,000. Astor agreed to create a mortgage on the sublease in favor of the Riss family. The mortgage on the sublease was never executed by Astor, but the Riss family knew that Astor was in the process of syndicating the sublease for operation of the South building, and the prospectus for the syndication shows that a mortgage existed in favor of the Riss family in the sum of $1,000,000. Finally, Astor's installment undertaking was a general obligation of the corporation.

 Determination of the fair market value of a long-term installment obligation is a question of fact. See Campagna v. United States, 290 F.2d 682 (2d Cir.); Miller v. United States, supra; Doric Apartment Co. v. Commissioner of Internal Revenue, 94 F.2d 895 (6th Cir.); cf. Slater v. Commissioner of Internal Revenue, 356 F.2d 668 (10th

Cir.); A. & A. Tool & Supply Co. v. Commissioner of Internal Revenue, 182 F.2d 300 (10th Cir.). The finding of the trial court of such value will not be disturbed on review if it is supported by substantial evidence and is not clearly erroneous. Rule 52, Fed.R.Civ.Proc.; Rudolph v. United States, 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484; Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 949; Wells-Lee v. Commissioner of Internal Revenue, 360 F.2d 665 (8th Cir.); Slater v. Commissioner of Internal Revenue, supra. Upon the record in the case at bar, we find substantial evidence for the Tax Court's determination of the fair market value of Astor's installment obligation, and we cannot say that the Tax Court's finding was clearly erroneous.

The taxpayer argues that Astor was insolvent when Astor cancelled the Riss family's indebtedness and contracted to pay $1,100,000 in monthly installments over eleven years, that the third mortgage on the warehouse was valueless as security, that the personal guarantees of Rapoport and Klein could not be given a market value because nothing was known of their resources; in short, the taxpayer urges that Astor's financial condition was so precarious, its prospects so dim, and its success so speculative, that the installment obligation had no market value whatever in the sale year of 1957. Although Astor's liabilities were $9,311,000 in November 1956, and were not materially changed in January 1957, the Tax Court found that Astor was not insolvent. The record is bare of any showing that Astor failed to meet its obligations as they became due. The highest values assigned by the taxpayer's expert witness to the warehouse and the South building, as remodeled, in 1957 were $1,440,000 and $9,980,000, respectively. The Commissioner's expert witness valued the same properties at $1,500,000 and $10,000,000, respectively. When the sale contract was executed the first and second mortgages on the warehouse had been reduced to approximately $1,100,000;

under the most optimistic value given for the warehouse the Riss family's $500,000 third mortgage was secured for $400,000.

Rapoport and Klein both testified that they had sufficient resources in 1957 to cover their personal guarantees in the total sum of $500,000. The taxpayer introduced no evidence directly controverting this testimony.

The Commissioner's expert witness testified that Astor's installment obligation should be discounted twenty-two per cent from its face value; other witnesses for the Commissioner testified that the fair market value of Astor's installment obligation would range from sixty per cent to eighty-five per cent of face value. The Tax Court found that the fair market value of Astor's installment obligation was seventy-eight per cent of face value. Evidence was also introduced showing that in 1957 seventy-five per cent of the South building was leased to desirable, rated tenants. Income projections for the South building were optimistic. The taxpayer has referred us to Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, and Miller v. United States, 235 F.2d 553 (6th Cir.). Those cases however presented quite different problems by reason of their facts.

There was, of course, conflicting evidence on the question of fair market value of Astor's installment obligation in January 1957, but upon the whole record we believe the Tax Court's finding of fair market value is supported by substantial evidence and is not clearly erroneous.

The final issue presented by the taxpayer is whether or not the Riss family should be permitted to use the cost recovery method for determining tax liability on the installment paid by Astor. The Tax Court held that payments received from Astor by the Riss family would be apportioned as follows: twenty-two per cent would be taxable as additional capital gain realized over the $858,000 fair market value of the obligation, and seventy-eight per cent would be

**972**

tax free as the realization of capital gain upon which tax had already been paid. The taxpayer, citing Wingate E. Underhill, 45 T.C. No. 46 (Feb. 28, 1966), argues that he should be permitted to recover the full fair market value of $858,-000 before any additional tax is assessed because it was speculative that the full face value of Astor's obligation would be recovered. Underhill is not controlling because the Tax Court determined that Astor's obligation was not speculative.

Affirmed.