R. Paul **SPRAGUE** and Mary G. Sprague, Plaintiffs-Appellants,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 78–1777.

United States Court of Appeals,
Tenth Circuit.

Argued May 9, 1980.

Decided Aug. 14, 1980.

---

Gene A. Castleberry, Oklahoma City, Okl., for plaintiffs-appellants.

Robert T. Duffy, Atty., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before McKAY, BREITENSTEIN and MARKEY.*

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

MARKEY, Chief Judge.

Action by R. Paul Sprague (Sprague)[1] for refund of federal income taxes. The district court held that the taxpayers' stock transaction did not qualify for installment sale reporting and that they were therefore not entitled to a refund. *Sprague v. United States*, 42 A.F.T.R.2d 78–5877, 78–2 U.S.T.C. ¶ 9650 (W.D.Okla. Aug. 2, 1978). We reverse.

## Background

R. Paul Sprague was a partner in Pelham Associates (Pelham), that owned stock in IHC, Inc. (IHC). Several banks held most of the stock as collateral for loans to Pelham.

Pelham contracted to sell the IHC stock in 1970. Because the purchaser, Transairco, Inc. (Transairco), was unable to pay the $1,654,584 selling price in cash, the parties agreed to a deferred payment plan. Settlement occurred on September 10, 1970. Pelham received a $485,359.04 downpayment (approximately 29.3% of the total selling price), composed of $239,662.91 in cash and $245,696.13 in debt assumption and satisfaction by Transairco. The balance of the price was reflected in a series of notes Transairco issued to Pelham. The notes had due dates after 1970.

To secure release of the IHC stock from its creditor-banks, Pelham assigned the Transairco notes to the banks as substitute collateral for its loans. Pelham remained primarily liable on its original debts.[2] Each note was made out in the exact amount Pelham owed a bank and had due dates coinciding with the due dates of a Pelham loan. The Banks were to look to Transairco only after Pelham defaulted, and to look to security supplied by Transairco only after Transairco defaulted on its notes.

Transairco had agreed to secure the notes by letters of credit but had difficulty obtaining them. To avoid delay in closing, the parties agreed in August 1970 that Transairco could supply certificates of deposit as temporary security, with the right to replace the certificates with letters of credit. In October 1970, the certificates were withdrawn and the notes were secured by nonassignable and irrevocable letters of credit having draw and expiration dates coinciding with the due dates of the notes. The letters were issued directly to the banks and could be drawn upon by them only if Transairco defaulted on its notes.

Pelham became substantially dormant shortly after the sale. With one exception, Pelham's banks received payment on Pelham's loans, when those payments came due, by drawing on the letters. The only exception occurred in 1973, when Transairco obtained an injunction prohibiting a bank from drawing on the letter assigned to it. That dispute was settled. Though Pelham made no payment of principal, it was often called upon to pay, and did pay, interest.

On his 1970 tax return, Sprague used the installment method[3] to report his share of

---

1. Mary G. Sprague is a party solely because she filed joint tax returns with Sprague.

2. One bank released Pelham as the primary obligor but retained Pelham as a secondary obligor, the original Pelham note being retained as additional security for the Transairco note. Whether the release resulted in year-of-sale debt relief for Pelham is, however, irrelevant because its value is included in the $485,359.04 downpayment.

3. I.R.C. § 453 provides in pertinent part:
   Installment method
   (a) Dealers in personal property—
     (1) In general—
     Under regulations prescribed by the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

   \*   \*   \*   \*   \*   \*

   (b) Sales of realty and casual sales of personalty—
     (1) General rule—
     Income from—

   \*   \*   \*   \*   \*   \*

     (B) a casual sale or other casual disposition of personal property . . . for a price exceeding $1,000,
   may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a).

Pelham's profit on the stock sale. As a result, his reported income for 1970 was more than offset by losses sustained during that year. Sprague claimed a loss carryback to 1967 and sought a $905.53 refund of his taxes for that year.

The Internal Revenue Service (IRS) refused Sprague's refund on the ground that Pelham received more than 30% of the selling price of the IHC stock in the year of sale, i. e., 1970, and thus disqualified itself and its members from reporting the sale on an installment basis. See I.R.C. § 453(b)(2), supra note 3.

In the IRS's view, Pelham constructively received year-of-sale payments equal to the value of Transairco's certificates/letters, and those payments plus the downpayment exceeded 30% of the selling price. Alternatively, the IRS felt that assignment of those certificates/letters to Pelham's banks was tantamount to Transairco's assumption of Pelham's debts and that the value of the year-of-sale debt relief plus the downpayment exceeded the 30% limit. The IRS thus increased Sprague's 1970 income to include his entire profit on the stock sale, thereby wiping out his 1967 loss carryback.

Sprague sued the Government for recovery of the $905.53 refund plus interest. Both parties moved for summary judgment. The district court denied Sprague's motion, granted the Government's, and entered a judgment that Sprague was not entitled to report his profit from the stock sale on an installment basis. Sprague appealed.

### Issues

The issues are whether Pelham (1) constructively received year-of-sale payments equal to the value of the certificates/letters, or (2) realized year-of-sale debt relief by assignment of those certificates/letters to its banks, in either case receiving thereby more than 30% of the selling price in the

(2) Limitation—
    Paragraph (1) shall apply only if in the taxable year of the sale or other disposition—
        (A) there are no payments, or
        (B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

year of sale and disqualifying Sprague from reporting his profit on an installment basis.

### OPINION

I.R.C. § 453(b)(2)(B), supra note 3, provides that "evidences of indebtedness of the purchaser," for example, purchaser's notes, are not to be treated as year-of-sale payments received by a seller for the purpose of determining whether year-of-sale payments exceeded 30% of the selling price. The value of the secured Transairco notes should therefore be excluded in determining whether Pelham's year-of-sale receipts exceeded the 30% limit.[4] I.R.C. § 453(b)(2)(B) would thus compel reversal of the decision below. The Government, however, seeks to escape the thrust of this code provision, asserting in this case that Pelham received more than 30% in the sale year. In essence, the Government, realizing that it cannot rely on the purchaser's "evidences of indebtedness," Transairco's notes, reaches for the security underlying those notes. The distinction is here one without a difference.

### (1) Constructive Receipt

The "constructive receipt" theory, relied on by the Government to justify inclusion of the value of the security behind the Transairco notes, is in truth a blend of three distinct theories.

First, the Government says the nature of the security makes the notes certain of collection. Because Pelham was virtually guaranteed collection of cash equalling the value of the security, says the Government, the security is the equivalent of cash and Pelham should be treated as if it had collected that cash at the time of sale.

We disagree. It has been long settled that secured notes stand on the same plane as unsecured notes for purposes of the installment sale limitation on year-

4. The parties agree that the Transairco notes are not within the special classes of notes rendered includable as year-of-sale payments by I.R.C. § 453(b)(3).

of-sale payments. *R. L. Brown Coal & Coke Co. v. Commissioner*, 14 B.T.A. 609 (1928).[5] Both are mere promises to pay. The maker of either instrument permanently surrenders nothing of value except his promise. The giving of security is not payment and does not transform the promise to pay into a completed payment. It merely makes the promise more certain of fulfillment. *See Williams v. Commissioner*, 429 U.S. 569, 578, 97 S.Ct. 850, 856, 51 L.Ed.2d 48 (1977).

The value or cash-equivalency of the security cannot adequately serve as criterion in the present context. It would be impractical for the taxpayer and the IRS to evaluate a security and determine whether its "quality" was such as to create some indeterminate and indeterminable level of risk that the note payee would or would not get paid. Moreover, consideration of the "quality" of security would unfairly penalize those most careful and successful in protecting themselves against buyer default, who would thereby disqualify themselves from the tax advantages of installment reporting. Hence, the Government's "certainty of collection" theory must be rejected.

The second theory moves slightly closer to the traditional concept of constructive receipt.[6] In essence, it is argued that Pelham should be treated as though it had received the value of the security in the year of sale because it was free to convert the security into ready cash during the sale year.

That argument is meritless here. Pelham had no right to receive cash from Transairco's bank before Pelham and Transairco entered into the agreement creating the security arrangement. After the security was established, Pelham still had no enforceable right to receive cash except under the terms and conditions set out in the security instruments. Neither the certificates nor the letters could be drawn upon unless and until Transairco had defaulted on its notes. No note being due during the sale year, that restriction prevented Pelham from receiving cash in the year of sale. No ability or opportunity of Pelham to benefit from the security before Transairco's default, whether by conversion into cash or by assignment of a right to receive cash, ever existed. Hence, the traditional constructive receipt doctrine is inapplicable here.[7]

---

5. *Pozzi v. Commissioner*, 49 T.C. 119 (1967), *Oden v. Commissioner*, 56 T.C. 569 (1971), and *Trivett v. Commissioner*, 36 T.C.M. (CCH) 675 (1977), aff'd, 611 F.2d 655 (6th Cir. 1979), discussed in the text *infra*, do not hold that secured notes must be included as year-of-sale payments.

6. That concept is summarized in Treas.Reg. § 1.451.2(a):
   Constructive receipt of income.
   (a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

7. Cases relied on by the Government are distinguishable.
   In *Williams v. United States*, 219 F.2d 523 (5th Cir. 1955), a taxpayer sought to sell timber. The high bidder sought to pay the full

price in cash. The taxpayer agreed, but directed the buyer to place most of the cash into an escrow account for unconditional disbursement to the taxpayer over a four year period. The court denied installment reporting, holding when the taxpayer in constructive receipt of the escrowed money he accepted the bid because at that time the funds were fully available to him. In the instant case, Transairco never offered to pay the full price in cash and Pelham never had the luxury of controlling the disposition of cash. The certificates/letters were not self-imposed limitations on Pelham's receipt of cash otherwise fully available to it. Nor did they provide for unconditional disbursements of cash to Pelham. They were mere security devices, designed to provide Pelham with cash under certain conditions precedent occurring after the year of sale.
   In *Watson v. Commissioner*, 613 F.2d 594 (5th Cir. 1980), a taxpayer sold his cotton crop to a gin. By prearrangement, the gin issued a "Deferred Payment Authorization," directing a bank to pay the purchase price to the taxpayer, but not before January 10th of the following year. On the same day, the gin transferred the full price to the bank and the bank issued a letter of credit to the taxpayer guaranteeing

The third theory is that the certificates/letters were not truly security but were in reality payment for Pelham's stock.[8] That theory, primarily based on tax court decisions, seeks to apply "substance over form."

In *Pozzi v. Commissioner, supra* note 5, a buyer sought to purchase in cash but was refused. The taxpayer proposed an installment sale and the buyer accepted. The buyer opened an escrow account with cash equalling the purchase price. As each payment came due, the buyer sent a check to the escrow bank, the bank drew a check on itself in favor of the taxpayer and returned the same amount to the buyer out of the escrow account. The tax court found the transaction indistinguishable from one in which the taxpayer collected the full purchase price at the time of sale and deposited it in his own account. The installment arrangement lacked reality because the full price was at all times on deposit with the escrow bank, which merely swapped funds each time a payment came due.

In *Oden v. Commissioner, supra* note 5, and *Trivett v. Commissioner, supra* note 5, the buyer's promise to make periodic payments was secured by certificates of deposit in an escrow bank. The bank drew on the certificates to make payments to the taxpayer regardless of whether the buyer was in default. The tax court held that the notes evidencing the buyer's promise to make periodic payments were a nullity because they were not in reality evidences of the buyer's indebtedness. Nor were the certificates mere security. The court looked at the conduct of the parties and the bank and concluded that the parties intended at the time of sale that the taxpayer would look only to the certificates for unconditional periodic payment. The buyer had effectively satisfied its debt to the taxpayer when it purchased the certificates and the taxpayer thereafter regarded the bank, not the buyer, as the debtor.[9]

A "substance over form" determination necessarily depends on the facts and circumstances peculiar to each case. *See Oden v. Commissioner, supra* note 5, at 578. As reflected in the foregoing cases, the essence of that determination is the effective relief of a purchaser, at the time of sale, from his obligation to pay, and the substitution of an intermediary as obligor. The purchaser sheds his obligation by irrevocably placing in escrow sufficient cash or its equivalent to pay the full amount of his debt to the seller.[10] At that point, the transaction is essen-

---

payment under the "Authorization." The court held the taxpayer in constructive receipt of the full price in the year of sale, because the right to proceeds from the letter was readily marketable by him for cash. Here, collection on the certificates/letters was conditioned on Transairco's default, making them worthless in the marketplace. The tax court's opinion had suggested in *dicta* that a seller who receives a well-secured short term note is in constructive receipt of the entire principal. *Watson v. Commissioner,* 69 T.C. 544, 552–53 (1978) *Watson* did not, however, involve an installment sale case. Secured notes of a buyer are not year-of-sale payments received by a seller for purposes of installment reporting under section 453.

**8.** The Government correctly notes that I.R.C. § 453(b)(2), *supra* note 3, does not exclude evidences of indebtedness of persons other than the buyer from year-of-sale payments received by a seller. *Caldwell v. United States,* 114 F.2d 995, 997–98 (3d Cir. 1940). However, a letter of credit is not an evidence of indebtedness. It is merely a promise by a bank to lend money under certain circumstances. *Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l*

Bank, 611 F.2d 465, 469 (3d Cir. 1979); *Pringle-Associated Mortgage Corp. v. S. Nat'l Bank,* 571 F.2d 871, 874 (5th Cir. 1978); *Colorado Springs Nat'l Bank v. United States,* 505 F.2d 1185, 1190 (10th Cir. 1974).

**9.** The Government also relies on *Griffith v. Commissioner,* 73 T.C. No. 76 (Feb. 28, 1980). In that case, the buyer's promise to make periodic payments was secured by a letter of credit which could be drawn upon only if the buyer defaulted. The buyer's bank had required him to put up certificates of deposit as a condition to its issuance of the letter. A majority of the tax court found the case indistinguishable from *Oden v. Commissioner, supra* note 5. The dissenting judges viewed the letter of credit as merely security, noting that resort to it was contingent upon the buyer's default and that the buyer never defaulted. We agree with the dissenters.

**10.** In *Pozzi, Oden* and *Trivett, supra* note 5, the buyers agreed to an installment arrangement at the sellers' insistence. Whether the buyer *could have* paid or was *willing* to pay the full

tially complete for the purchaser, who has no further interest in it. The escrow agent becomes a substitute obligor if, at the time of sale, the seller is able to look to the escrowed funds for unconditional periodic payment of the purchase price.

The instant transaction lacks those indicia.

The purchaser, Transairco, did not irrevocably pay anyone the full price of the stock. Indeed, it was unable to do so. There is no evidence that the bank issuing the letters of credit required Transairco to put up cash. The certificates of deposit may have reflected cash put up by Transairco but, if so, Transairco had the power to withdraw those instruments at any time, and did so within two months.

Nor did Transairco walk away from the transaction after it issued the secured notes. Transairco sued to enjoin collection on one letter, evidencing that the letters were mere security and were not to be routinely looked to for periodic payment. The certificates/letters could not be looked to for unconditional periodic payment, because of the requirement that Transairco first default on its notes. The coinciding dates and amounts of the security and notes being a common arrangement, we cannot infer from that fact that the parties plotted a Transairco default.

Hence, we cannot conclude that the certificates/letters were a "substance over form" payment for Pelham's stock.

The district court thus erred in holding that Pelham constructively received year-of-sale payments equal to the value of the certificates/letters.

### (2) *Debt Relief*

■ Debt relief received by a seller in the year of sale is included in determining whether payments in that year exceeded 30% of the selling price. *Riss v. Commissioner*, 368 F.2d 965, 968 (10th Cir. 1966).

The Government contends that Pelham received year-of-sale debt relief because its debts to its banks were "assumed" in the year of sale. *Sub-silentio*, the government implies that an assumption of a debt automatically relieves the original debtor from his obligation to the creditor. That is not the law. *Cucullu v. Hernandez*, 103 U.S. 105, 116, 26 L.Ed. 322 (1881).

For example, in the present case, the banks did not accept the notes as payment of Pelham's debts. The agreement between Pelham and the bank to which Pelham was most indebted stated that the notes were only "further security" and that acceptance of the notes "shall in no way affect the obligation of Pelham." Affidavits from officers of Pelham's other banks stated that their release of the IHC stock and acceptance of the Transairco notes was a mere substitution of collateral that did not reduce or relieve Pelham of its primary liability. Pelham's notes were not cancelled and were not to be cancelled until the banks received payment. The banks called on Pelham to pay interest, an act inconsistent with a year-of-sale satisfaction of Pelham's debts.

The Government argues that the banks' attitude toward the transaction should not be controlling. Whatever their attitude, the banks' actions are controlling here. The banks loaned money to Pelham on the condition that Pelham pay it back in periodic cash payments, and did not relinquish the right to insist on exact compliance with that condition. A different mode or source of repayment would therefore be ineffective in discharging Pelham's debt, absent approval by the banks. That the banks did not take Transairco notes as payment for Pelham's debts establishes that Pelham's debts were not satisfied in the year of sale.

Moreover, though the agreement of sale between Pelham and Transairco did state Transairco "will assume" Pelham debts, that language was followed by "subsequent

---

price in this case is irrelevant. Our only inquiry is whether he *did* effectively pay. It is also irrelevant that the seller alone insisted on installments. A taxpayer may reap the advan-

tages of an installment sale, if the same actually transpires, whether or not his purpose was to minimize his tax. *Rushing v. Commissioner*, 441 F.2d 593, 598 (5th Cir. 1971).

to January 1, 1971" and "subsequent to January 1, 1972."[11] Similarly, the Transairco notes merely recited promises to make payments to Pelham in 1971 and 1972, and made no mention of Pelham's debts. Nothing of record indicates that Pelham's assignment of the notes to its banks was intended to effect a year-of-sale assumption. In addition, the certificates/letters were collectible only if and when the Transairco notes were in default, an event that could not occur in 1970, the year of sale. Viewed together, those documents could support, at most, an irrelevant finding that Transairco promised to assume Pelham's debts after 1970.[12]

The Government's final argument, the theme of which permeates its entire brief, is that the banks' release of the IHC stock and acceptance of the secured Transairco notes was not a mere substitution of collateral but a sham arrangement, designed to camouflage a prearranged novation substituting Transairco for Pelham. Noting Pelham's dormancy shortly after the sale, Pelham's and Transairco's failure to make principal payments on their notes, and the creditor-banks' use of the letters for payment of Pelham's debts, the Government concludes that Pelham was allowed to walk away from its debts in the year of sale, knowing they would be satisfied by the letters. Therefore, says the Government, Pelham should be treated as though it re-

ceived year-of-sale debt relief. The analysis falters.

Although Pelham's post-sale dormancy and inattention to its debts may suggest that it thought itself relieved of those debts, Pelham's belief is irrelevant. A debtor cannot unilaterally relieve himself of liability. The banks retained Pelham as primary obligor and could at all times have looked to it for payment.

The critical flaw in the Government's analysis, however, is that it relies entirely on innocuous events occurring after the date of sale in an effort, *nunc pro tunc*, to create an appearance of a sham transaction. None of those events evidenced an intent existing at the time of sale that the transaction was anything but an installment sale. The Government's suggested "wait and see" approach would be unfair to honest taxpayers attempting to structure a valid installment sale. There is no evidence that, at the time of sale, Pelham and Transairco intended to default on their notes. Unforeseeable and unintended post-sale events should not adversely affect the tax treatment given a transaction initially qualified for installment reporting.

As structured, the instant transaction qualified for installment reporting. The reasons for post-sale dormancy of Pelham and defaults by Pelham and Transairco were not developed in the record but the

11. Though we find no year-of-sale assumption in the present case, we note the Government's reliance on *Riss v. Commissioner, supra,* and *Horneff v. Commissioner,* 50 T.C. 63 (1968), *vacated pursuant to stipulation,* 24 A.F.T.R.2d 69–5593 (3rd Cir. Jan. 29, 1969). However, those cases involved more than a mere assumption, *i. e.,* a promise to pay a debt. In *Riss,* the taxpayer's debt was *cancelled* in the year of sale. In *Horneff,* the taxpayer's debt was assumed and *paid* in the year of sale. The tax court has also found debt relief where the taxpayer received a *novation* in the year of sale. *Cisler v. Commissioner,* 39 T.C. 458, 465 (1962). In each instance, the taxpayer's personal obligation was extinguished in the year of sale. The only case cited by the Government wherein a mere assumption was held to constitute debt relief even though the taxpayer remained liable on the debt is *Republic Petroleum Corp. v. United States,* 613 F.2d 518 (5th Cir. 1980). Unlike the present case, that case involved a

sale of mortgaged property and was thus controlled by the unique provisions of Treas.Reg. § 1.453–4(c).

12. The Government correctly notes that the letters of credit, issued in October 1970, referred to Transairco's assumption of Pelham's debts in the past tense. However, a reading of the letters in the context of the entire transaction indicates that they did not refer to an assumption occurring before October 1970. As earlier discussed, the banks took the Transairco notes only as collateral for debts on which Pelham was to remain primarily liable. The banks were to look to Transairco only after Pelham defaulted and they were to look to the letters of credit only after Transairco defaulted. The past tense reference to Transairco's assumption was therefore a grammatically correct statement of a condition precedent to collection on the letters.

evidence that exists suggests only that both experienced unforseen financial difficulties. Without more, we are unwilling to infer that the parties perpetrated the prearranged sham visualized by the Government.

### Conclusion

The district court erred in finding that Pelham constructively received year-of-sale payments equal to the value of the certificates/letters and that Pelham realized year-of-sale debt relief by the assignment of those certificates/letters to its banks. Sprague was entitled to report his profit from the stock sale on an installment basis. Accordingly, the district court's judgment in favor of the Government is reversed.[13]

---

**13.** The Government says we should remand if we hold Sprague entitled to installment reporting. In its view, Pelham "disposed of" the Transairco notes within the meaning of I.R.C. § 453(d) when it assigned them to its banks and remand is necessary to determine Sprague's gain on that transaction. We disagree. Pelham did not dispose of the Transairco notes. It simply posted them as collateral in substitution for the IHC stock.