KENROY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kenroy, Inc. v. Commissioner
Docket Nos. 10094-74, 10011-75.
United States Tax Court
T.C. Memo 1984-232; 1984 Tax Ct. Memo LEXIS 443; 47 T.C.M. (CCH) 1749; T.C.M. (RIA) 84232; April 30, 1984. *443 K was engaged in the developing of real estate and the providing of real estate services. During 1971, T, G, and I, the principal shareholders of K, decided to develop a parcel of vacant land for their own account. In December 1971, while the purchase was being closed, T, G, and I decided that K should also participate in the development. They also decided that part of the property should be developed with an office building and that the remainder should be developed with a hotel. On January 3, 1972, RMOC, a limited partnership, was formed to develop the office building acreage, and K received an 88.2-percent interest in RMOC. K owned an interest in ATV, a joint venture which owned other land. In 1971, ATV sold part of such land, receiving in part payment therefor the purchaser's promissory note which was guaranteed by another corporation. K conceded several of the adjustments made by the Commissioner. Held:
(1) Regardless of the reason for allowing K to acquire an interest in RMOC, K received no income upon its receipt of such interest because the interest, as valued by the net assets of the partnership less the limited partners' contributions, was worthless when acquired. *444 The value of the property at such time determined. (2) For purposes of determining the portion of gain that ATV must report in the year of sale under the installment method, the note was not a year-of-sale payment. Sec. 453, I.R.C. 1954. (3) K's underpayment of tax for 1972 was due to negligence. Sec. 6653(a), I.R.C. 1954. Richard Hirschtritt,Norton Gold,Harvey M. Silets, and Steven S. Brown, for the petitioner. Val J. Albright, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioner's Federal income taxes: Additions to Tax
Taxable
Sec. 6653(a)
Sec. 6653(b)
Docket No.
Year Ended
Deficiency
I.R.C. 1954 [1]
I.R.C. 1954
10094-74
May 31, 1971
$872,587.21
$436,293.60
10011-75
May 31, 1972
1,496,778.00
$74,839.00
After concessions by the parties, the issues remaining for decision are: (1) Whether the petitioner received taxable income as a result of its acquisition of an interest in a partnership; (2) whether a promissory note was a year-of-sale payment within the meaning of section 453; and (3) whether the petitioner is liable for the addition to tax for negligence for its taxable *445 year ended May 31, 1972 (section 6653(a)). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Kenroy, Inc. (Kenroy), is a corporation organized under the laws of the State of Delaware. Kenroy had its principal place of business at Skokie, Ill., when it filed its petitions. Kenroy filed its U.S. Corporation Income Tax Return for its taxable years ended May 31, 1971, and May 31, 1972, with the Internal Revenue Service Center, Kansas City, Mo. The petitioner filed an amended return for its 1971 year. During the years in issue, Kenroy was a cash method taxpayer. Kenroy will sometimes be referred to as the petitioner. A taxable year shall be referred to by the year in which it ended. In 1955, Kenneth Tucker and Roy Gottlieb (R. Gottlieb) formed a partnership to engage in the brokerage of land and the construction and sale of single-family homes.The incorporated the business under Illinois law during 1961. Kenroy was incorporated in Delaware in November 1969, and the Illinois corporation was merged into it. In 1971, the principal *446 shareholders of Kenroy were Mr. Tucker, who owned 40 percent of the common stock and was Kenroy's president, R. Gottlieb, who also owned 40 percent of the common stock and was the chairman of the board of directors, and Alan Inbinder, who owned 11 percent of the common stock and was Kenroy's executive vice president. During the years in issue, Kenroy engaged in the acquisition and development of vacant land, the independent brokerage of improved and unimproved land, and the provision of real estate consulting and appraisal services. From 1967 through 1971, Kenroy derived substantially all of its income from its participation in real estate development ventures and from the provision of brokerage services. If Kenroy wished to participate in a development project, it first sought and acquired vacant land and then entered into a joint venture or limited partnership to develop the project. Generally, the investors provided most of the equity capital, and Kenroy provided development services and nominal capital. Kenroy performed no construction activities, but it performed or hired others to perform many other services necessary to the development. For its services in connection with *447 the acquisition of the property, Kenroy generally received a brokerage fee from the venture or limited partnership upon its formation. Kenroy also received commissions or management fees for its subsequent activities relating to the development. In addition, Kenroy provided real estate brokerage, development, or management services to independent parties in connection with projects in which Kenroy did not have an ownership interest. From 1969 through 1971, Kenroy's directors explored the possibility of becoming a publicly held corporation, and in May 1971, they resolved to proceed with a public offering of Kenroy stock. The directors voted to limit Kenroy's activities with respect to the acquisition and ownership of depreciable income-producing real estate so as not to depress Kenroy's earnings per share during the public offering. However, because of market conditions, Kenroy was unable to get the desired stock price, and Kenroy did not go public during 1971. On March 20, 1972, Kenroy's executive committee decided to terminate the offering for the present. In the 1960s, Kenroy was approached by the Beck Company to find land upon which Beck could construct a hotel. During the *448 same period, a Kenroy salesman advised Mr. Tucker that a parcel of 19.7076 acres of land located in Rolling Meadows, Ill. (the property), was available. The property was subsequently sold to Royal Coach of Chicago, Inc. (Royal Coach), a subsidiary of the Beck Company. Beck's financial situation deteriorated, and it sold its assets, including the Royal Coach stock, to the Downtowner Corporation (Downtowner). Royal Coach planned to develop a motel on the property. During 1969, representatives of Royal Coach met at least five times with the Plan Commission of the City of Rolling Meadows to obtain approval for the motel. Royal Coach also contracted for engineering, surveying, and construction work with respect to the property. ContinentalIllinois Realty (CIR), a real estate investment trust headquartered in Los Angeles, Calif., held a mortgage of $1,450,000 on the property. Royal Coach fell behind on the mortgage interest payments and on payments to the contractors, three of who filed mechanic's liens against the property. Royal Coach then sought a purchaser for the property. By early 1971, Mr. Tucker had learned that the property was again available. CIR was interested in developing *449 the property with an office building and hotel complex in a joint venture with Kenroy. During March 1971, Mr. Tucker contacted several other potential joint venturers and also prepared an evaluation of the market for a hotel located on the property. He negotiated with Downtowner for the purchase of the property and with Robert Rickerl of CIR regarding financing. During the negotiations, no final decision was apparently reached regarding whether Kenroy or its principals would participate in the Rolling Meadows development and whether any outside joint venturers would participate. As late as April 28, 1971, Kenroy's directors were contemplating that Kenroy would develop the property in a joint venture with CIR. However, by the end of May 1971, Mr. Tucker had decided that he, R. Gottlieb, and Mr. Inbinder, alone, should initially acquire the property for their own account. By May 25, 1971, CIR had agreed to issue a new first mortgage of $1,750,000 with respect to the property, subject to an appraisal of $2,300,000, although both CIR and Mr. Tucker believed it would be difficult to obtain such a high appraisal. The loan proceeds were to be applied to the existing loan ($1,450,000) *450 and to interest ($300,000). CIR required that the "top $300,000" of the loan be personally guaranteed. In a memorandum to R. Gottlieb and Mr. Inbinder dated May 25, 1971, Mr. Tucker stated: It is my recommendation because of the financial structuring of this acquisition and because it will definitely be a development program as opposed to a land sale, that we take this deal personally. * * * [O]ur costs * * * are as follows: Mortgage
$1,450,000
Downtowner Corporation
350,000
Commissions due Kenroy
100,000
Potential accrued interest
per schedule attached
400,000
Sometime prior to June 4, 1971, Mr. Tucker asked James P. Foley to appraise the property. On that date, Mr. Foley sent a letter to Mr. Tucker stating that he had appraised the property and concluded that its market value was $2,350,000. In his letter, Mr. Foley stated that he would forward a formal appraisal report. However, Mr. Foley was never paid for the appraisal, and his report was never sent. On June 9, 1971, Mr. Rickerl submitted the application for the mortgage on the property to CIR's trustees for their approval. In his memorandum to the trustees, he stated: At the request of the borrowers the property was appraised by *451 James P. Foley, M.A.I., for $2,350,000, however we have not received a copy of the appraisal at this time. The Trust previously had the property appraised in September 1970 by Real Estate Appraisal Company of Chicago who valued the property at $1,500,000. It is our opinion that the property is more realistically valued at the latter figure, however, because of the excellent location and future potential for the property it does have an extremely attractive upside potential. On June 14, 1971, CIR's trustees approved the loan; CIR's minutes show the borrower as Kenroy. On June 14, 1971, Mr. Tucker, R. Gottlieb, Mr. Inbinder, and LaSalle National Bank (LaSalle), as trustee, executed a "Trust Agreement and Declaration of Trust" creating Trust No. 42445 (the land trust). The land trust specified that LaSalle, as trustee, was about to take title to the property and that Mr. Tucker, R. Gottlieb, and Mr. Inbinder each would have a one-third beneficial interest in such property. Kenroy's principals often utilized a land trust for property acquisitions, whether they took title in Kenroy's name or for their own account. On or about June 18, 1971, LaSalle, as trustee, and Royal Coach executed *452 the real estate contract. The contract recited a purchase price of $1,790,000, consisting of $100,000 to discharge the existing mechanic's liens, $1,440,000 to discharge the existing mortgage, and $250,000 payable to Royal Coach in three installments. Royal Coach acknowledged receipt of a $25,000 earnest money deposit. Mr. Tucker, R. Gottlieb, and Mr. Inbinder each provided $10,000 for a total of $30,000 from which the earnest money was paid. The payment to Royal Coach was made by a check drawn on the account of Mr. Tucker and his wife at LaSalle.The remaining $5,000 was deposited to an account in the name of "Rolling Meadows Office Center c/o Kenroy, Inc." (RMOC), which was opened at Continental Bank on July 12, 1971. On August 10, 1971, books of account were opened for RMOC. An addendum to the purchase contract provided that if the sale was consummated, the "buyer" would pay a brokerage commission to Kenroy. The addendum also provided that Mr. Tucker, R. Gottlieb, and Mr. Inbinder would personally guarantee the first of the installments due Royal Coach and the first $300,000 of the new mortgage. On June 18, 1971, Mr. Tucker sent a memo to Kenroy's counsel requesting him to *453 prepare a short form partnership agreement relating to the property acquisition. He requested that the agreement show only that he shared equally with R. Gottlieb and Mr. Inbinder in the venture and that, when additional partners joined, the original partners' shares would decline equally. No such agreement was even prepared or executed. Sometime after the execution of the purchase contract, Mr. Tucker prepared a memorandum in which he stated that $225,000 in cash would be necessary to close the purchase. He stated that, although the property had cost them approximately $2.00 per square foot, he believed that it was worth between $3.50 and $4.00 per square foot. Finally, he stated that $108,000 was owed Kenroy on the land sale and that "Kenroy, Inc. who will not be a partner in this deal, will be the exclusive broker and receive commissions accordingly." At the annual meeting of Kenroy's stockholders on September 24, 1971, Mr. Tucker in his President's report, spoke of the Rolling Meadows project as if it were a Kenroy development. However, at the directors' meeting on the very next day, Mr. Tucker, R. Gottlieb, and Mr. Inbinder informed the board that they were handling the Rolling *454 Meadows deal personally. The board agreed that the project was not a good investment for Kenroy since it involved depreciable income-producing property. During the fall of 1971, Mr. Tucker prepared for the closing on the property. He obtained an increase in CIR's loan commitment to $1,900,000 to cover interest owed by Royal Coach to CIR, which had to be paid before the closing. Mr. Tucker also had to secure a short-term loan to obtain the cash necessary for the closing. Morton Fink and Perry Fink were willing to loan the cash necessary to close, but they did not want to participate in the development. On November 24, 1971, Mr. Tucker sent a memo to Morton Fink detailing the application of funds at the closing. In such memo, Mr. Tucker also described how he hoped ultimately to structure the financing and stated, "We would then evaluate the office building market and determine whether or not we want to proceed with such a program. We then can also determine our personal exposure on this venture and discuss the possibility of converting same to Kenroy." On November 30, 1971, Mr. Tucker and R. Gottlieb borrowed $150,000 form Perry Fink and $100,000 from Morton Fink. The loans were *455 evidenced by promissary notes, payable on December 30, 1971, and signed by R. Gottlieb on behalf of himself and Mr. Tucker. The loans were recorded on the RMOC books on November 30, 1971, as notes payable, and the proceeds were deposited to RMOC's bank account on December 1, 1971. On December 1, 1971, Mr. Tucker, R. Gottlieb, and Mr. Inbinder withdrew their capital contributions from RMOC. During early December 1971, Mr. Tucker located investors to participate in the development of the property; by December 10, 1971, William Gottlieb (W. Gottlieb) and Barry H. Mogul had agreed to invest in the venture. Mr. Tucker had also decided to split the property into a 13-acre parcel for the office center and a 6.7076-acre parcel for the hotel. In a memorandum to R. Gottlieb on December 10, 1971, Mr. Tucker stated that he favored Kenroy's participation in the office center development only. On December 10, 1971, the executive committee of Kenroy's board of directors, consisting of Mr. Tucker, R. Gottlieb, Mr. Inbinder, and two other directors, met to discuss the Rolling Meadows project. Mr. Tucker, R. Gottlieb, and Mr. Inbinder announced that the Rolling Meadows project would be a good investment *456 and that it would be in the best interest of Kenroy to participate. Accordingly, the executive committee resolved that, because circumstances had changed since the September directors' meeting, would participate with Mr. Tucker, R. Gottlieb, and Mr. Inbinder "in the acquisition of approximately 13 acres of" the property. Prior to the December 10 meeting, CIR informed R. Gottlieb that it would not make the $1,900,000 loan unless Kenroy, as well as Mr. Tucker, R. Gottlieb, and Mr. Inbinder personally, guaranteed payment of $460,000 of the loan. At the December 10 meeting, the executive committee authorized Kenroy's execution of the guarantee. On December 13, 1971, Mr. Tucker signed a check drawn on the RMOC account for $24,000, payable to Kenroy for commissions. The property closing was handled through an escrow agent. On December 13, 1971, the agent issued escrow instructions to the buyer and the seller. On December 1, 1971, Royal Coach executed a deed of the property to a third party, and on December 14, 1971, the third party executed a deed to LaSalle as trustee. On that date, LaSalle executed a note payable to CIR for $1,900,000 with a mortgage on the property as security. *457 Mr. Tucker, R. Gottlieb, and Mr. Inbinder, the three beneficiaries of the land trust, assigned their beneficial interests therein to CIR for security, and they, along with Kenroy, executed a guarantee in favor of CIR of $460,000 of the $1,900,000 loan. The $460,000 represented the difference between the new loan and the existing mortgage. Kenroy in ture indemnified the three principals.The guarantee provided that the guarantors' obligations would cease when the property was appraised at such a value that the outstanding balance of the loan and interest was less than or equal to 75 percent thereof. The loan proceeds were disbursed as follows: Interest impound account
$ 310,000.00
Existing mortgage through 12/13/71
1,564,586.50
Mortgage interest 12/14 - 12/21/71
3,278.88
Net proceeds to mortgagor
22,134.62
Total
$1,900,000.00
The net mortgage proceeds of $22,134.62 and a check from the RMOC account in the amount of $175,256.54 drawn by Mr. Tucker on December 15, 1971, provided the cash needed to close.Of that amount, $100,227.04 was used to satisfy the mechanic's liens against the property, and the balance was paid to Royal Coach. Kenroy contributed no funds toward the purchase of the property. *458 The secrow was closed on December 29, 1971.
On January 3, 1972, W. Gottlieb executed an agreement with Kenroy, Mr. Tucker, R. Gottlieb, and Mr. Inbinder. The agreement provided that, in consideration of W. Gottlieb's investment of $225,000 in a joint venture regarding the property, the other parties agreed to pay him that amount with interest at 5-1/2 percent over the prime rate and to make him a limited partner to the extent of "10% of the partnership interest held by Kenroy, Inc., Ken Tucker, Roy Gottlieb and Alan Inbinder." The agreement also provided: Said principal and interest will be prepaid to you, however, prior to any distribution of profits to Kenroy, Inc., Ken Tucker, Roy Gottlieb, or Alan Inbinder. Said principal and interest shall be prepaid to you proportionately with distributions to Kenroy, Inc., Ken Tucker, Roy Gottlieb, Alan Inbinder, or Barry Mogul relative to the amounts of principal investment of each outstanding at the time of such prepayment. On January 3, 1972, Kenroy, as general partner, and Mr. Mogul and W. Gottlieb, as limited partners, executed a limited partnership agreement. The partnership was called the Rolling Meadows Office Center Venture, which *459 we shall also refer to as RMOC. The agreement provided that the property to be acquired by RMOC consisted of 13 acres of the 19.7 acres. The remainder of the property was to be acquired by the Rolling Meadwos Hotel Venture (RMHV), a limited partnership consisting of Mr. Tucker, R. Gottlieb, and Mr. Inbinder as general partners, and W. Gottlieb and Mr. Mogul as limited partners. The RMHV partnership agreement was also executed on January 3, 1972. The partnership agreements provided that the initial capital was contributed solely by the limited partners and that the partners were to have the following interests in the profits and losses of the partnerships: RMOC
Partner
Capital Contribution
Profit and Loss
William Gottlieb
$148,500
9.8%
Barry Mogul
16,500
2.0%
Kenroy, Inc.
88.2%
RMHV
Partner
Capital Contribution
Profit and Loss
William Gottlieb
$76,500
9,8%
Barry Mogul
8,500
2.0%
Kenneth Tucker
29.4%
Roy Gottlieb
29.4%
Alan Inbinder
29.4%
Kenroy received its 88.2-percent interest in the RMOC partnership without having made any cash investment in the partnership. The two partnership agreements also provided that Kenroy was to be the exclusive broker for the leasing, management, or sale of the partnership property *460 and improvements and that Kenroy was to receive total commissions of $60,480 for the acquisition of the property. The RMHV agreement also provided that Kenroy would receive a $25,000 commission for its negotiation of a management contract with Hilton Hotels, Inc., to be paid upon the commencement of the hotel construction. Both partnership agreements provided that, for the convenience of the partners, the title to the two portions of the property would remain in LaSalle as trustee and that "The Partnership shall hold the undivided beneficial interest in said Trust with the Power of Direction to be in the General Partner." However, LaSalle's records reveal that, from 1971 through 1980, Mr. Tucker, R. Gottlieb, Mr. Inbinder, and no others, each held a one-third beneficial interest in the land trust.
On January 4, 1972, Mr. Mogul drew a check for $25,000 payable to R. Gottlieb. On January 3, 1972, W. Gottlieb drew checks payable to R. Gottlieb for $225,000. R. Gottlieb endorsed the checks over to the Finks in full payment of the loans which the Finks had made to Mr. Tucker and R. Gottlieb.
The payments by Mr. Mogul and W. Gottlieb were initially credited to their respective capital *461 accounts in RMOC's general journal, offsetting the debit of the Finks' loan accounts. The capital contributions were then allocated, pursuant to the partnership agreements, between RMOC and RMHV.Finally, 6.7076 acres of the property were transferred to RMHV by crediting the appropriate RMOC account. The property was irregularly shaped, bounded on the north by Algonquin Road and Orchard Drive and bounded on the west by the State Route 53 overpass. The southwest corner of the property was a line curving from northwest to southeast along the interchange connecting Route 53 with the Northwest Tollway. The property had an irregular frontage along Algonquin Road and Orchard Drive. During 1972, the property was vacant. It was roughly level; some grading and drainage work had been performed, and some underground improvements made. All utilities, including sewer, water, gas, electric, and telephone service were available. The site was zoned R-7 (Apartment, Office and Institutional) and was located approximately 3 miles from the center of town. The neighborhood around the property was primarily commercial, with some apartment and residential development and some vacant land. The City *462 of Rolling Meadows is a Chicago suburb located approximately 28 miles northwest of the Loop. Rolling Meadows was a planned community of 5.3 square miles. Its development began after World War II, and the first residents moved in during 1953. Between 1960 and 1970, the city's population grew from 10,879 to 18,907, and in 1972, more than 20,000 people lived there.The city consists of single-family homes, apartments, commercial and business sections, and an industrial park. The main shopping area is centered on Kirchoff Road, somewhat to the north of the property. On Kenroy's behalf, Mr. Inbinder requested that R. J. Schmitt and Associates appraise the property. On May 17, 1972, Mr. Schmitt and Charles A. Benson submitted their report; they determined that the fair market value of the property was $3,434,000, or $4 per square foot, on May 16, 1972. On February 19, 1971, Kenroy and Kenroy, Inc. Employee's Profit Sharing Trust executed an agreement creating a joint venture, the Army Trail Venture (the venture). The venture was formed to develop 322 acres of vacant land located in Addison, Ill. (the Addison property). Kenroy had a 95-percent interest in the profits and losses of *463 the venture. During its taxable year ended May 31, 1971, the venture kept its books and filed its income tax returns using the cash method of accounting. On May 27, 1971, the venture sold approximately 255 acres of the Addison property to Land First, Inc. (Land First). On the same day, in partial payment of the purchase price, Land First executed a promissory note payable to the order of Kenroy and providing for total payments of $950,000. The note was guaranteed by the Klingbeil Company (Klingbeil). The guarantee recited that Klingbeil was financially interested in Land First and provided that the venture could proceed directly against Klingbeil upon any default on the note, without first looking for payment to the borrower, any security, or any other guarantor.The amounts of the principal payments provided by the note, their due dates, and the date such payments were made, were as follows: Amount
Date Due
Date Paid
$170,500
January 1, 1972
January 4, 1972
240,000
April 1, 1972
April 6, 1972
100,000
June 1, 1972
June 9, 1972
90,000
January 1, 1973
January 9, 1973
290,000
April 1, 1973
March 21, 1973
59,500
June 1, 1973
June 4, 1973
$950,000
On or before August 15, 1971, the venture filed its U.S. Partnership *464 Return for its taxable year ended May 31, 1971. The venture elected to report its gain on the sale by use of the installment method provided by section 453. The venture reported $395,640 of ordinary income for 1971, computed as follows: Selling Price
$4,120,500
Costs of sale
2,761,763
Profit
[2] $1,358,737
Gross profit ratio
($1,358,737/$4,120,500)
[3] 32.97%
Payment received in year
of sale
$1,200,000
Ratio of payment received
to selling price
29.12%
($1,200,000/$4,120,500)
Amount of gain reported in 1971
($32.97% X $1,200,000)
$ 395,640
Included in the $1,200,000 reported as payment received in the year of sale was the $950,000 promissory note. On its amended return for 1971, the venture recharacterized the $395,640 gain as long-term capital gain. On its return for its 1972 taxable year, Kenroy did not report any income attributable to the acquisition of its interest in RMOC. In his notice of deficiency for 1972, the Commissioner determined that Kenroy's interest in RMOC was worth $1,233,305 and that Kenroy had received such interest as compensation for *465 services. On its original corporate income tax return for 1971, Kenroy reported its share of the $395,640 of ordinary income reported by the venture as a result of the Addision property sale. On its amended return for 1971, Kenroy, in accord with the amended return filed by the venture, recharacterized its share of the gain as long-term capital gain. At the trial, Kenroy amended its petition to allege that the $950,000 note received by the venture should not have been included as a payment received in the year of sale for purposes of section 453. Prior to the trial of this case, Kenroy conceded several of the Commissioner's adjustments to its 1972 return. Kenroy conceded that it was not entitled to claim a loss from the Barrington Green Venture, that it overstated its basis in the Arlington Dundee Venture and the Tollview Meadows Building Venture in computing the gain on the sale of its interests in such ventures, that it erroneously reduced its income from the Moeller Farm Venture and the Moehling Lacina Venture, that the Army Trail Venture overstated its basis in land sold by it in 1972, and that Kenroy could not substantiate over $35,000 of claimed entertainment and selling *466 expenses. OPINION The first issue for decision is whether the petitioner received taxable income as a result of its acquisition of an 88.2-percent interest in RMOC. The Commissioner contends that the petitioner received such interest as compensation for services that it performed in connection with the acquisition of the property and that, on January 3, 1972, such interest had a fair market value of $367,319.53. The petitioner contends that it did not receive its partnership interest as compensation for services; it suggests that it acquired such interest in one of two ways: as a contribution to its capital under section 351, or as a result of its participation in the purchase of the property and a contribution of the interest so acquired to RMOC under section 721. The petitioner also asserts that the net fair market value of its interest in RMOC on January 3, 1972, was zero. As a general rule, the fair market value of property received as compensation for services must be treated as ordinary income, and such rule applies if the property received is stock or a partnership interest. Secs. 61(a)(1), 351(d)(1); secs. 1.61-2(d)(1), 1.721-1(b)(1), Income Tax Regs.; see also sec. *467 83. [4] Of course, if the property so received is worthless, the recipient has received no income. See St. John v. United States, an unreported order ( C.D. Ill., Nov. 16, 1983, 84-1 U.S.T.C. par. 9158, 53 A.F.T.R. 2d 84-718). The petitioner and the Commissioner have agreed that the value of the petitioner's interest in RMOC is 88.2 percent of RMOC's net asset value on January 3, 1972, after reduction for the limited partners' contributions. The only significant difference in the computations is that the Commissioner asserts that the property was worth $2,467,500 on January 3, 1972, while the petitioner contends that the property was then worth $1,800,000. [5] *468 If the petitioner's valuation is correct, its interest in RMOC was worthless of January 3, 1972, and accordingly, it had no ordinary income regardless of how it acquired such interest. Thus, the valuation question may be dispositive of the first issue, and we now direct our attention to it. The determination of the fair market value of property at a given date is a question of fact. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). The term fair market value has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both being reasonably informed as to all relevant facts. Sec. 20.2031-1(b), Estate Tax Regs.; Alvary v. United States,302 F.2d 790, 794 (2d Cir. 1962); Epstein v. Commissioner,53 T.C. 459, 472 (1969); Newberry v. Commissioner,39 B.T.A. 1123, 1128-1129 (1939). The petitioner has the burden of proving that the Commissioner's *469 determination of value was erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure[6]; Brittingham v. Commissioner,66 T.C. 373, 410 (1976), affd. per curiam 598 F.2d 1375 (5th Cir. 1979). The parties have presented various forms of evidence and testimony, including that of expert witnesses, in order to substantiate the values alleged by them. The Commissioner's valuation of the property was based primarily on the testimony and opinion of James P. Foley. Mr. Foley is a member of the American Institute of Real Estate Appraisers (MAI designation) and is a member of the Society of Real Estate Appraisers (SRPA designation). He has been appraising real estate since 1954 and received his MAI designation in 1963. Mr. Foley prepared a letter to Mr. Tucker on June 4, 1971, stating that the fair market value of the property was $2.75 per square foot, or $2,350,000. Mr. Foley was not paid for his evaluation, and he never prepared a formal appraisal report. Mr. Foley testified that he inspected the property before he prepared the appraisal letter. He also testified that he had appraised other parcels *470 in Rolling Meadows and that he maintained files regarding real estate transactions involving properties comparable to this property.He testified that he generally used comparable data in rendering his appraisals, but that he could not recall whether he had done so in the present case, nor could he recall what comparables he might have used. Mr. Foley testified that had he known that this property would be sold within 2 weeks for $1,790,000, such knowledge would have influenced his appraisal. The Commissioner's valuation is also based upon an appraisal, dated May 17, 1972, prepared by R. J. Schmitt and Charles A. Benson. Mr. Benson is a member of the American Institute of Real Estate Appraisers (MAI designation) and of the Society of Real Estate Appraisers (SRPA designation).He began appraising real estate in 1942 and received his MAI designation in 1959. Mr. Benson concluded that on May 16, 1972, the value of the property was $3,434,000, or $4 per square foot. In making his appraisal, Mr. Benson did not consider the 1971 sale of this property. Prior to making his appraisal, Mr. Benson physically inspected the property and analyzed the immediate neighborhood in which it was located. *471 He also obtained data regarding 11 properties located in the same general vicinity. The 11 properties ranged in size from less than 1/2 acre to 40 acres. Six of the comparable parcels were less than 1 acre in size, three others were less than 4 acres in size, and of the remaining two, one was 35 acres and the other was 40 acres in size. The sale dates ranged from 1969 to February 1972. Ten of the eleven properties had been sold; the prices per square foot ranged from $1 to $3. The 11th property, less than 1 acre in size, had been leased, and Mr. Benson's capitalization of the lease yielded a land value of $3.74 per square foot. Both the 35-acre property and the 40-acre property were located within 1/2 mile of this property. The 40-acre parcel was bounded by the Northwest Tollway and Route 53 and was subsequently developed with an office building. Its selling price, in February 1972, was $1.43 per square foot. The 35-acre parcel was bounded by Algonquin Road. Its selling price in March 1971 was $1.49 per square foot. The appraisal report indicated that some of the comparable data should be adjusted for time, location of the property, and overall utility of the property. Mr. *472 Benson also testified that, generally speaking, smaller properties tended to have higher prices per square foot than larger ones and that the selling prices of the properties which were less than 1 acre should probably be adjusted down to compare with this property. The petitioner places its primary reliance on the testimony of William A. McCann. Mr. McCann is a member of the American Institute of Real Estate Appraisers (MAI designation) and of the Society of Real Estate Appraisers (SRPA designation). He has been appraising real estate since 1958. Mr. McCann did not prepare an appraisal of the property. He testified that he had appraised many properties in the area immediately surrounding it and that he was familiar with the trend of property values there during 1971. He first became familiar with the property in particular in 1968 when he utilized the sale of it to Royal Coach as a comparable sale in connection with another appraisal. Mr. McCann testified that property in the Rolling Meadows area was generally appreciating at a rate of about 10 percent annually. In his opinion, the value of the property in December 1971 was approximately $1,800,000. Mr. McCann also testified *473 that, in his opinion, the comparable data utilized in the Schmitt report did not support the opinion of value contained therein. Mr. McCann stated that only the 35-acre property and the 40-acre property were truly comparable to this property and that the sales prices of such properties were less than $1.50 per square foot. He concluded that such data clearly indicated that the value of this property was far less than the appraised value of $4 per square foot. In addition to the experts' opinions regarding the value of the property, there is also evidence of the 1971 opinions of Mr. Tucker and Mr. Rickerl. In an undated memorandum written prior to the acquisition of the property, Mr. Tucker stated that he believed that it was worth between $3.50 and $4.00 per square foot. On the other hand, in his memorandum to CIR's trustees, Mr. Rickerl stated that, in his opinion, the property was more realistically valued at $1,500,000, at which it had been appraised in September 1970, than at $2,350,000, the amount determined by Mr. Foley. Neither Mr. Tucker nor Mr. Rickerl documented his estimate of the value of the property. On January 3, 1972, the property was unimproved and was not generating *474 any income; thus, we agree that the market approach to value is the most appropriate method for estimating the value of the property on such date. Wolfsen Land & Cattle Co. v. Commissioner,72 T.C. 1, 19 (1979); Estate ofFawcett v. Commissioner,64 T.C. 889, 899 (1975); Estate ofNail v. Commissioner,59 T.C. 187, 193 (1972); see generally American Institute of Real Estate Appraisers, The Appraisal of Real Estate 263-323 (7th ed. 1978). Three experts testified regarding the value of the property; however, Mr. McCann prepared no appraisal report, and Mr. Foley did not prepare a formal appraisal report and could not remember the comparable data upon which he relied for his appraisal. Moreover, Mr. Benson did not consider the 1971 sale of this property in his appraisal. Thus, the comparable data before us consists of the 11 comparables in the Schmitt report and the 1971 sale of the property itself. In 1971, the property was sold for $1,790,000 ($2.09 per square foot), and the petitioner contends that such price closely approximated the property's fair market value on January 3, 1972. A contemporaneous arm's length sale of the property constitutes persuasive evidence of value. Douglas Hotel Co. v. Commissioner,14 T.C. 1136, 1141 (1950), *475 affd. 190 F.2d 766 (8th Cir. 1951); Co-operative Publishing Co. v. Commissioner,5 B.T.A. 340, 343 (1926); see generally, J. Eaton, Real Estate Valuation in Litigation 139 (1982). [7] However, the Commissioner asserts that during 1971 Royal Coach was financially depressed and eager to sell the property and that the sales price was not representative of its fair market value. The Commissioner points out that Royal Coach had fallen behind in its interest payments to CIR and that several contractors had filed mechanic's liens against the property. While Royal Coach may have been financially drained during 1971 and while its owners desired to sell the property, we cannot accept the Commissioner's argument that the opinions of his experts more accurately reflected value than did the sale price. Mr. Foley's opinion and testimony must be given little weight since he could provide no data concerning comparables or other information to support his conclusion. Moreover, we agree with Mr. McCann that the best comparable data in the Schmitt report were the 1971 sale of the 35-acre parcel and the 1972 sale of the 40-acre parcel. The 9 remaining *476 properties were all less than 4 acres in size and of them, 6 were less than 1 acre in size. The selling prices of such properties simply are not comparable to that of a large multi-acre tract since the price per square foot of the smaller tracts tends to be greater. Even so, only 1 of the 11 properties sold for more per square foot than the value the Commissioner asserts. The 35- and 40-acre properties were both located within one-half mile of the property, were accessible by the same roads, and were each sold during the years in issue for less than $1.50 per square foot. The 40-acre parcel, like this property, was ultimately developed with an office building. In summary, we believe that the market data support the petitioner's valuation. Our conclusion is buttressed by the fact that CIR, which financed the acqusition of the property, did not believe that its value was adequate to secure the debt of $1,900,000. CIR required that the petitioner, Mr. Tucker, R. Gottlieb, and Mr. Inbinder personally guarantee a portion of the loan; the guarantee provided that it would no longer be binding when the amount of the loan did not exceed 75 percent of the value of the property. CIR's contemporaneous *477 valuation is persuasive evidence that the loan amount of $1,900,000 was more than 75 percent of the value of the property at the end of 1971 for CIR relied on its valuation in structuring the terms of the loan. Mr. McCann had been personally familiar with the property since 1968, and he had appraised many other properties in the Rolling Meadows area. He was familiar with property values there during the years in issue, and his valuation is supported by a preponderance of the evidence. On this record, we conclude that the property had a fair market value of $1,800,000 on January 3, 1972. Accordingly, the petitioner's interest in RMOC had no value on such date, and we hold for the petitioner with respect to the first issue. [8] *478 See St.John v. United States,supra; Beaird v. United States, 231 Ct. Cl.     (Aug. 20, 1982), order dismissing petition based on opinion of Trial Judge White dated June 30, 1982, 50 A.F.T.R. 2d 82-5222, 82-2U.S.T.C. par. 9452. The second issue for decision is whether the $950,000 promissory note received by the venture upon the sale of the Addison property was a year-of-sale payment within the meaning of section 453. During the years in issue, section 453(b) provided generally that a seller of real property on the installment plan could elect installment reporting of his gain. However, section 453(b)(2) provided that such election could only be made when the payments received in the year of sale did not exceed 30 percent of the selling price. The statute expressly provided that year-of-sale payments did not include an evidence of indebtedness given by the purchaser. Section 453(b)(3) provided that an obligation was not considered an evidence of indebtedness *479 of the purchaser if such obligation was essentially equivalent to cash; i.e., if it was payable on demand, issued by a corporation or government with interest coupons or in registered form (except for registered obligations not readily tradable in an established securities market), or issued by a corporation or government in any other form designed to render it readily tradable in an established securities market. [9] *480 The regulations provided that, if under section 453(b)(3) an obligation was not treated as an evidence of indebtedness of the purchaser, then the receipt by the seller of such obligation was treated as a payment for purposes of determining whether payments in the year of sale exceeded 30 percent of the sale price.The regulations further provided that, if the sale nevertheless qualified for installment treatment, the receipt of the obligation constituted a payment for purposes of determining the amount of gain to be reported during the year of sale. Sec. 1.453-3(b), Income Tax Regs.
The petitioner contends that the venture should not have included the $950,000 note as a year-of-sale payment for purposes of computing the portion of the gain on the sale of the Addison property reportable in 1971. The petitioner observes that the note was an evidence of Land First's indebtedness and was not within any of the categories that would cause it to be treated as a cash equivalent and thus a payment under section 453(b)(3). The petitioner also notes that the draftsmen of section 453(b)(3) did "not intend that ordinary promissory notes are to be included within the category of indebtedness which is treated as payments received in the year of sale, even though it is possible for these notes to be assigned by one party to another party." S. Rept. 91-552 (1969), 1969-3 C.B. 423, 516. We agree with the petitioner that the note by its terms did not come within the provisions of section 453(b)(3); such note was payable in specified *481 installments, not on demand, and it was not issued in such a form as to be readily tradable. The Commissioner argues that the Klingbeil guarantee somehow caused the Land First note to be treated as a payment received in the year of sale. However, nothing in the terms of the guarantee causes the provisions of section 453(b)(3) to apply to the note. The guarantee did not make the note payable on demand because the venture could only proceed against the guarantor in the event of a default by Land First. Nor is there any indication that the guarantee caused the note to be considered as a coupon or registered obligation, or as one otherwise readily tradable on an established securities market. Finally, there is no indication that the guarantee caused Land First to be relieved of its obligation to pay the note or that the venture expected Klingbeil to pay the note by virtue of its guarantee. Cf. Trivett v. Commissioner,611 F.2d 655 (6th Cir. 1979), affg. a Memorandum Opinion of this Court; Williams v. United States,219 F.2d 523 (5th Cir. 1955); Griffith v. Commission,73 T.C. 933 (1980); Oden v. Commissioner,56 T.C. 569 (1971). On the contrary, the evidence indicates that Land First *482 remained the primary debtor and that Klingbeil was to be resorted to for payment only in the event of a default. Cf. Sprague v. United States,627 F.2d 1044 (10th Cir. 1980); Porterfield v. Commissioner,73 T.C. 91 (1979). The Commissioner has provided no evidence to show that the transaction was other than it appeared to be. We conclude that the Land First note should not have been reported by the venture as a payment received in the year of sale. Accordingly, we hold for the petitioner with respect to this issue. The third issue for decision is whether the petitioner negligently underpaid its income tax for 1972. The petitioner bears the burden of disproving the correctness of the Commissioner's determination concerning this issue. Rule 142(a); Bixby v. Commissioner,58 T.C. 757, 791 (1972). The petitioner conceded many of the Commissioner's adjustments to its 1972 return. The petitioner asserts that its underpayment of tax was not due to negligence but rather due to the fact that, between June and November 1971, its accounting staff was greatly overburdened with work arising in connection with the public offering and that, during such period, its chief accountant contracted *483 multiple sclerosis. The petitioner also relies upon the complexity of several of the adjustments to its 1972 return. The petitioner presented little evidence regarding the negligence issue. Mr. Tucker testified in a very general way regarding the burden on the petitioner's accounting staff and the illness of its chief accountant. However, we do not recognize the validity of the petitioner's excuses. The fact that the petitioner was engaged in an attempted public offering of stock does not relieve it of its obligations to file accurate returns and pay taxes. Additionally, although some of the adjustments may be considered complex or "technical," we do not believe them to be beyond the comprehension of the petitioner's accountants. During 1972, the petitioner was engaged in many sophisticated real estate transactions, utilizing a variety of legal entities. The complexity of the Commissioner's adjustments mirrors the sophistication of the petitioner's transactions; the intricacies of its business operations to not relieve the petitioner of the duty to exercise due care in the maintenance of its books and records and in the preparation of its returns. We conclude that the petitioner *484 has failed to prove that its underpayment for 1972 was not due to negligence. Accordingly, we sustain the Commissioner's determination with respect to this issue. [10] To reflect concessions by the parties, Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. At trial, the petitioner conceded that the realized gain was $1,458,992. ↩
3. At trial, the petitioner conceded that the gross profit ratio was 35.408%.↩
4. Neither party contends that the petitioner's interest in RMOC was ever nontransferable or subject to a substantial risk of forfeiture. ↩
5. Both parties value the petitioner's interest in RMOC using similar formulas: .882 times RMOC's net worth less the limited partners' contributions; i.e., value of real estate (.66 X value of property) plus interest impound (.66 X $310,000) less mortgage (.66 X $1,900,000) less limited partners' contributions ($165,000). The parties's computations differ in three particulars. In addition to the differing values that they attributed to the property, the Commissioner includes cash of $4,732.24 as an asset and accrued interest of $2,420.19 as a liability, but the petitioner does not include such items in his computation.
6. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
7. See also Slater v. Commissioner,T.C. Memo. 1959-125↩.
8. Thus, the present case is distinguishable from Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974). There, the taxpayer received an interest in the profits of a partnership as compensation. Within 3 weeks after he acquired such interest, the taxpayer sold it for $40,000. We held that the taxpayer's interest was taxable as ordinary income upon his receipt of it. We also held that the interest was properly valued at $40,000 and rejected the petitioner's argument that the interest was worthless. 56 T.C. at 546-547. See generally St. John v. United States, an unreported order ( C.D. Ill., Nov. 16, 1983, 84-1 U.S.T.C. par. 9158, 53 A.F.T.R. 2d 84↩-718).
9. The 30-percent limitation was repealed by the Installments Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247. The treatment of evidences of indebtedness given by the purchaser is now governed by sec. 453(f)(3) and (4), also added by the 1980 Act.Sec. 453(f)(3)↩ expressly provides that the term "payment" does not include receipt of evidences of indebtedness of the purchaser, even if payment of the debt is guaranteed by another person.
10. At trial, the petitioner objected to the introduction into evidence of an interoffice memorandum drafted by its counsel setting forth various legal theories concerning the petitioner's acquisition of its interest in RMOC. Such memorandum was inadvertently disclosed to the Commissioner's counsel prior to the trial. Since we found it unnecessary to decide how the petitioner acquired its interest in RMOC, we express no opinion regarding the admissibility of such memorandum. The Commissioner objected to the introduction into evidence of several Forms 4549, Income Tax Examination Changes, regarding the amounts of income reported by the petitioner's shareholders during 1972 upon their receipt of portions of the petitioner's interest in RMOC. We have resolved the valuation issue in the petitioner's favor without the need of considering such evidence, and we express no opinion regarding its admissibility.↩